## MARY E. SMITH *vs.* WM. J. HOOPER ET AL., TRUSTEES.

*Life Tenant of a Trust Fund Entitled Only to Income and Not to Profits Made Upon Sales of Investments—Fund the Income of Which Was Given to a c. q. t. for Life, Greatly Increased by Changes of Investments—Remanding a Cause for Further Proceedings—Jurisdiction of the Court of Appeals.*

When the income from a sum of money bequeathed in trust is given to a tenant for life he is not entitled to the profits, however large, which arise from advantageous sales of the property in which the trustee invested the fund, but only to the dividends or interest paid from time to time on the investments.

A testator bequeathed $10,000 to trustees in trust to pay the "dividends and income thereof" to his daughter during her life, with remainder over after her death. Power was given to the trustees to invest the fund in such property, stocks, etc., as in their judgment may be advisable and to change the investments in their discretion  In 1887, the trustees bought the property of a canmaking factory for about $8,000 of the trust fund and this property they turned over to a corporation receiving therefor 300 shares of its capital stock.  In 1888 they sold 50 shares of the stock for $5,000.  In 1889, the trustees invested $10,000 in buying 350 shares of the stock of the Tri-State Can Co.— the *c. q. t.* contributing personally about $2,700 of this sum.  In 1901 the Am. Can Co., a corporation with a capital of 88 millions, bought the two companies in which the trust fund was so invested and the trustees received for their shares in these two companies $54,000 in cash, 1142

shares of the preferred stock of the Am. Can Co., 1142 shares of its common stock, and 62 shares of stock in the J. Co. The trustees subsequently sold a part of their shares of the Am. Can Co., and the result of the investments and reinvestments of the original trust fund of $10,000 augmented by the $2,700 contributed by the *cestui que trust*, is that the trustees now hold $83,856, in cash, 1142 shares of the preferred stock of the Am. Can. Co., worth when the bill in this case was filed $74,230, certain shares in the J. Co., of no present value, and they have paid to the *cestui que trust* about $30,000 in dividends and interest. The increase of the trust fund over and above the original $10,000, was claimed in this case by the *cestui que trust* to belong to her as income. *Held*,

1st. That the increase in the amount of the trust estate, arising as above set forth, is not income from, or dividends upon, the original trust fund in the sense in which those words are used in the will, but is a profit arising from the sales of the property in which the fund was invested, and consequently forms part of the *corpus* of the trust estate.

2nd. That since the *cestui que trust* herself contributed about $2,700 to the $10,000 invested by the trustees in the stock of the Tri-State Can Co., she is entitled to receive the same proportion of the entire profits arising from the sale of that stock to the Am. Can Co., as $2,700 bears to $10,000.

Upon a motion to remand the cause for amendment of the pleadings and production of evidence, *Held*,

1st. That since the cause was heard and decided upon a bill and an answer admitting the allegations of the bill to be true, which is similar to an agreed statement of facts, this Court, being one of appellate jurisdiction only, has no power to remand the record so that the pleadings may be amended simply upon the allegation that the conceded facts are not true, when it has no power to ascertain by evidence whether the allegation of error is correct or not, and when that allegation is denied by the opposite party.

2nd. That the provisions of Code, Art. 5, sec. 36, to the effect that when it shall appear to this Court that the substantial merits of a case will not be determined by affirming or reversing a decree or that the purposes of justice will be advanced by permitting further proceedings, then the Court, instead of passing a final decree, shall remand the cause to the lower Court for such further proceedings as shall be necessary for determining the cause upon its merits, are not applicable to this motion, *first*, because such a remanding must be made before a final decree and upon the ground that a final decree cannot be passed upon the record as it stands without doing injustice ; and *secondly*, because such a remanding is allowed only when it is shown to the Court by the record in the case either that the substantial merits of the cause will not be determined by an affirmance or a reversal, or that the purposes of justice will be advanced by permitting further proceedings.

Cross appeals from a decree of the Circuit Court No. 2, of Baltimore City, (WICKES, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Charles E. Hill,* for Mary E. Smith.

All that has come out of the legacy of $10,000.00 as a result of the use made of it by the trustees, is income and should as such be paid to the life beneficiary. The terms "dividends and income," used by the testator, cover all profits or proceeds coming from the use of the trust funds. *Hooper* v. *Rossiter,* 1 McCleland, 5-36; *People* v. *Supervisors,* 4 Hill, 20; *Andrews* v. *Boyd,* 5 Me. 503; *Read* v. *Head,* 6 Allen, 174.

Income signifies that which comes in. It is as large a word as can be used to denote receipts. It is the gain which accumulates from property, labor or business. *Jones* v. *Ogle,* 42 L. J. Ch. 336; *Ex-parte Huggins,* 21 Ch. Div. 85; *McClintock* v. *Dana,* 106 Pa. St. 391; *State* v. *Rodman Lake,* 16 R. I. 511. Equity which disregards form and grasps the substance will award the profits, whether stocks, personal property or money to whomsoever is entitled to the income. *Moss' Appeal,* 83 Penn. St. 264; *Thomas* v. *Gregg,* 78 Md. 555.

There is no question here of stock dividends, or of increase in value of the capital or *corpus* of the trust estate. It is purely a question as to who is entitled to the profits made by the skillful handling of the trust funds by the trustees. It was not the intention of the testator that the trust funds should be used to accumulate or increase the *corpus* for the benefit of the remaindermen. Such an intention will not be implied unless it appear expressly upon the face of the will or be a necessary implication from its provisions. *Burt* v. *Gill,* 89 Md. 152. The trustees were not restricted to dividend or interest paying securities for their investments. When they invested a large part of the trust fund in the purchase of personal property from which *no dividends or interest* were received but from the sale or exchange of which large profits were realized; when

they used the trust funds in buying, selling or exchanging machinery, buildings, shares of capital stock, patent rights and options, it is respectfully submitted that the profits made from such use of the trust funds were "income" and belong to the life tenant and not to the remainder-men. *Harvard College* v. *Amory*, 9 Pick. 463; *Oliver's Estate*, 136 Penn. St. 43; *Earp's Appeal*, 28 Penna. 368.

The cases of *Thomas* v. *Gregg*, 78 Md. 555, and *Quinn* v. *The Safe Deposit and Trust Co.*, 93 Md. 285, show that life tenants are entitled to *extra* as well as *ordinary* profits earned pending their estates. *The profits of capital constitute income which enures to the life tenant*, no matter how large such income may be made by successful management. *Heighe* v. *Littig*, 63 Md. 305.

If the gift had been of specific property to Mrs. Smith for life with remainder over, it is conceded that she would have no right to share in the proceeds of a sale of that property, for such proceeds when realized would simply be the "measure of value of the specific property which by the terms of the will those in remainder would otherwise have had a right to demand at her death." But the gift was of cash and the *value of the corpus must be referred to the date of the testator's death.*

Had the gift been directly to Mrs. Smith for life with remainder over so that she would hold the legal as well as the equitable estate, $10,000 would have been the measure of her liability to those in remainder. The investment and reinvestment would have been in her control and whatever might be derived therefrom would be for her sole benefit. Holding the life estate she would be entitled to the *whole* income in the absence of any restrictions in the will. *Heighe* v. *Littig*, 63 Md. 304. Those in remainder would have no interest further than the safety of this *corpus*, $10,000.00, and its payment at her death. The mere separation of the legal and the equitable estate by the intervention of trustees does not change her beneficial estate. The purpose of separation was to vest in trustees the administration of the trust estate. The gift of the

beneficial interest was as absolute and as extensive as though coupled with the legal estate. "The gift being of cash and not of specific property the measure of the remainder is the amount of the gift at the date of the testator's death, and the measure of the life estate is the increase thereafter." *Porter Estate, Leech Appeal*, 173 Penn. St. 190.

*Frank Gosnell* (with whom was *T. M. Lanahan* on the brief), for the trustees.

It may have been that as to the R. Tynes Smith Can Company, the value of the shares was increased by reason of accumulation of profits over and above dividends declared and paid; and as to the Tri-State Can Company, it may have been, that the increase was brought about because no dividends at all were declared, and that the profits of the company, instead of being paid out in the shape of dividends, were accumulated by the company. Should the increase have been brought about as above suggested, the law is perfectly well settled that such accumulations form part of the value of the stock, and are not income to which the life tenant is entitled. *Gibbons v. Mahon*, 136 U. S. 549.

In the case at bar, the increase in the value of the shares of stock of the R. Tynes Smith Can Company and the Tri-State Can Company was probably largely brought about by the formation of the "trust" called the American Can Company. If so it is *corpus* and not income. The record discloses that the trustees did in fact receive in exchange for the stock held by them, the securities of the American Can Company, and the cash now in controversy. That such increase in value is "principal" and not "income" is clear upon authority. The precise question was decided by the Court of Appeals of England, *In re Armitage* [1893], 3 Ch. 337.

McSHERRY, C. J., delivered the opinion of the Court.

This record contains cross-appeals. Each appeal presents one question. Both questions grow out of the same facts and but one opinion will be needed to dispose of the whole con-

troversy.  The facts are not disputed in any way.  They are as follows :  By the seventh clause of the will of the late William E. Hooper, who died in eighteen hundred and eighty-five, there was bequeathed to his four sons and the survivors and survivor of them, the sum of ten thousand dollars "upon trust to invest the same and pay to (his) daughter, Mary Elizabeth Smith, during her lifetime, for her sole and separate use, the *dividends* and *income* thereof as the same shall accrue, without power to her to anticipate the payment of such income and dividends, or to charge or encumber the trust estate," with remainder over after the death of the daughter, to her children and the descendants of any deceased child, with a power of appointment by the daughter if no child or descendants of a deceased child survived her, and in the event of there being no child or descendant of a deceased child surviving the daughter and upon failure to make an appointment there is an absolute bequest of "this portion of" the testator's estate to all his grandchildren then living and the surviving issue of any deceased grandchild.  The fund was paid over to the trustees. By the nineteenth clause of the will the trustees were empowered "to invest the moneys that shall come into their or his hands  *  *  *  in such property, real or personal, stocks, bonds or securities, as in their or his judgment may be advisable, and all such investments from time to time to change or vary in their or his discretion ; as also to sell any property other than money coming to hand as parcel of the trust estate and the proceeds reinvest in their or his discretion, &c."

R. Tynes Smith, the husband of the *cestui que trust* was engaged in the manufacture of cans.  Associated with him was William A. Weeks, and the firm name was Smith and Weeks.  In the latter part of the year eighteen hundred and eighty-seven the property, buildings, letters-patent, machinery and tools of the firm were sold at public auction, and, by the request of the *cestui que trust*, were purchased by the trustees who paid therefor the sum of seven thousand, seven hundred and forty-four dollars and ninety-three cents, out of the

ten thousand dollar trust fund held by them under the seventh clause of the will. After paying for the property so purchased, the trustees still had in hand the sum of two thousand, two hundred and fifty-five dollars and seven cents, the residue of the ten thousand dollar trust fund. The trustees then transferred the property thus purchased by them, to a corporation formed under the general corporation laws of this State, which company was known as the R. Tynes Smith Can Company. In payment for the property so transferred, the trustees received from the company three hundred shares of its capital stock at its par value of one hundred dollars per share. Subsequently the trustees sold fifty shares of this stock for five thousand dollars. The five thousand dollars added to the two thousand, two hundred and fifty-five dollars and seven cents, part of the original ten thousand dollar trust fund, gave them seven thousand, two hundred and fifty-five dollars and seven cents in cash, in addition to the remaining two hundred and fifty shares of the capital stock of the R. Tynes Smith Can Company, still retained by them. At or about that time, as the seventh paragraph of the bill of complaint charges, the *cestui que trust*, Mary Elizabeth Smith, "paid over and delivered to" the trustees "the sum of two thousand, seven hundred and forty-four dollars and ninety-three cents, in cash for no other reason or purpose   *   *   *   *   than that they might still have in their possession and hold intact, without any abatement whatever, cash amounting to ten thousand dollars. In other words, that the cash in their hands might be restored to the original sum of ten thousand dollars, being the sum bequeathed to them in trust under the said seventh clause of the last will and testament of William E. Hooper, deceased." This sum of two thousand, seven hundred and forty-four dollars and ninety-three cents has relation to the question raised on the second appeal, but is alluded to now merely to preserve the continuity of the narrative. In 1889 Mr. Smith organized another corporation for the manufacture of cans. It was located at Keokuk, in the State of Iowa, and was called the Tri-State Can Company. The trustees

subscribed for ten thousand dollars of the capital stock of this company. They received three hundred and fifty shares and paid for them with the $2,255.07 of the original ten thousand dollar trust fund, in their hands as heretofore stated ; the $5,000.00 received by them from the sale of the fifty shares of the R. Tynes Smith Can Company's stock ; and the $2,744.93 turned over to them by Mrs. Smith as just above indicated. At that time the trustees held two hundred and fifty shares of the stock of the R. Tynes Smith Can Company and three hundred and sixty shares of the stock of the Tri-State Can Company. Up to February, 1901, they had collected in dividends on the two hundred and fifty shares, the sum of $27,500.00, and in interest on the ten thousand dollars or portions of it before its investment, the sum of $2,270.07, all of which had been paid over to the *cestui que trust.* In May, 1901, The American Can Company, a New Jersey corporation with a capital of eighty-eight millions of dollars, was formed. Its whole capital stock was divided into an equal number of common and preferred shares of the par value of one hundred dollars each. That corporation was organized for the purpose of acquiring the business of all other companies engaged in the manufacture of cans. It accordingly purchased the assets of both the R. Tynes Smith Can Company and the Tri-State Can Company. As a result of this absorption the trustees received in lieu of the two hundred and fifty shares of the R. Tynes Smith Can Company, then owned by them, nine hundred and sixty-two shares of the preferred and nine hundred and sixty-two shares of the common stock of the American Can Company ; 62 shares of the stock of another concern, and thirty-seven thousand, five hundred dollars in cash. They afterwards sold the nine hundred and sixty-two shares of common stock for twenty-five thousand, one hundred and fifty dollars and ninety-five cents. The final result of their investment of the $7,744.93 in the purchase of the property of Smith and Weeks is, that they now have in place of that sum, through the medium of the exchanges and sales alluded to, the $37,500.00 cash received

from the American Can Company, the $25,150.95 just mentioned, as the proceeds of the sale of the 962 shares of common stock—these items of cash aggregating $62,650.95—and the 962 shares of the preferred stock of the American Can Company, together with 62 shares of the Johnson Company.

The trustees received from the American Can Company in exchange for the 360 shares of the Tri-State Can Company, held by them, 180 shares of the preferred and 180 shares of the common stock of the American Can Company, and $16,500.00 in cash. They sold the 180 shares of the common stock for $4,705.89, and still retain the preferred. The final result of their investment in the Tri-State Can Company is this: In place of the $2,255.07 part of the original trust fund, the $5,000.00 realized by the sale of fifty shares of the R. Tynes Smith Can Company's stock, and the $2,744.93 turned over to the trustees by Mrs. Smith, they now have the $16,500 cash received from the American Can Company, the $4,705.89 realized by the sale of the 180 shares of common stock—or an aggregate of $21,205.80 in cash—and 180 shares of preferred stock.

The total result of the investment and reinvestment of the original trust fund augmented by the $2,744.93 contributed by Mrs. Smith is this: The trustees now hold 1,142 shares of the preferred stock of the American Can Company, worth when the bill was filed, sixty-five dollars a share, or $74,230.00; $83,856.31 in cash and 62 shares of the Johnson Company, of no present value; altogether aggregating $158,086.31; apart from the $29,770.07 of the dividends and interest heretofore paid to the *cestui que trust.*

Mrs. Smith, the *cestui que trust* insists that all of this enormous increase in the fund in excess of the original ten thousand dollars, belongs to her and should be paid to her as income from the fund, and should not be held by the trustees as part of the *corpus* of the trust estate. The trustees deny this. She also claims, alternatively, that she is not only entitled to a return of the $2,744.93 handed over by her to the

trustees, but to a ratable proportion of the gain made by the investment of that sum and the $7,755.07 in the 360 shares of the capital stock of the Tri-State Can Company. These are the questions which the record presents. The first is the one raised on the appeal of Mrs. Smith; the second is the one brought up on the appeal of the trustees. The Circuit Court decided the first adversely to her ; and it decided the second in her favor.

If this increase of $148,086.31 over and above the ten thousand dollars originally received by the trustees is *income* or *dividends* within the meaning of the seventh clause of the will, then, Mrs. Smith, the *cestui que trust* for life, is entitled to that increase, and the trustees can claim no part or parcel of it as capital. If on the other hand, that increase, created in the way hereinbefore minutely pointed out, is not *income* from or *dividends* upon the original trust fund, in the sense in which the words income and dividends are used in the will, then the $148,086.31, less the amount involved in the second appeal, forms part of the *corpus* of the trust estate and belongs, not to the *cestui que trust*, but to the persons entitled in remainder. And this is so because by the express terms of the will the *cestui que trust* is entitled *only* to income and dividends, and not to any part of the capital. So, the precise question on the first appeal is : Does this increase, thus accumulated, constitute income or dividends within the meaning and intent of the will ? It may not be out of place, before proceeding to solve that inquiry, to advert for a moment to several cases referred to in the argument. They are *Quinn* v. *Safe Deposit and Trust Co.*, 93 Md. 285; *Burt* v. *Gill*, 89 Md. 152, and *Thomas* v. *Gregg.* 78 Md. 555. Those cases mainly determine, not *what* is income or *what* are dividends, but *to whom* income and dividends, confessedly such belonged. In the case at bar there is no dispute as to *who* is entitled to this increase if it be income or dividends, but the question is, does that increase constitute income or dividends at all ? Obviously, therefore, the cases just referred to have no direct bearing upon this investigation.

"The word 'dividend,' if unqualified," said the Supreme Court of Errors of Connecticut, "signifies dividends payable in money. The word 'income' has a broader meaning, but hardly broad enough to include things not separated in some way from the principal. It is not synonymous with 'increase.' The value of stock may be increased by good management, prospects of business, and the like. But such increase is not income. It may also be increased by an accumulation of surplus; but so long as that surplus is retained by the corporation, either as surplus or increased stock, it can, in no proper sense be called 'income.' It may become producing, but it is not income." *Spooner* v. *Phillips*, 62 Conn. 62. (24 Atl. Rep. 524.) Surplus and accumulated reserve funds until set apart and appropriated by the corporatian for the payment of dividends are capital, and whatever their magnitude may be, they are not, as between life tenant and remainder-man, treated as income until they are distributed. *Gibbons* v. *Mahon*, 136 U. S. 549. Whether the value of the shares of stock originally acquired by the trustees upon the investment of the $7,744.93, was enhanced by the creation of a surplus fund, by good management and expansion of the company's' business or by the worth of the patent rights included in its assets, the record does not disclose. Nor does it inform us whether the stock now held in exchange for that acquired in the first instance, owes its value to similar causes. Whatever the actual causes may have been the fact is that the shares of stock have grown enormously in value and the things that have given them that value inhere in them still, since they have not been separated from them by any act of the corporation. There has been no segregation from the shares, of any of the elements which make up the value of the shares and until there is such a segregation all of those elements belong to the shares and pass with the latter when sold. The conversion of some of the shares into money resulted merely in substituting the cash received for the shares thus sold; and if the unsold shares represented nothing but capital, though capital of a largely increased value, the money

obtained for the same shares when sold can represent nothing but capital either.   Now, it is obvious, we think, that the cash received by the trustees from the sale of the fifty shares of the R. Tynes Smith Can Company and from the American Can Company on the exchange of the two hundred and fifty shares of the R. Tynes Smith Company and the three hundred and sixty shares of the Tri-State Company and from the sale of the shares of the common stock of the American Can Company, cannot be considered dividends.   None of that cash arose from a division of earnings.   The proceeds of the fifty shares took the place of the fifty shares and constitute capital. The cash received on the exchange of shares was not a dividend declared either on the surrendered shares of the constituent companies which were merged in the American Can Company, or on the newly issued shares of the American Can Company which took over and consolidated the business of the other canmaking companies.   Nor were the new shares, common or preferred, issued by the American Can Company, in any sense dividends on the shares of the companies which it absorbed.   It is clear, therefore, that the *cestui que trust* for life can make no claim to this increased value on the ground that any part of it is, or can be treated as, *dividends* on the original trust fund.

That there has been a marvelous *increase* of the fund is manifest.   Is that increase *income ?*   Increase and income are not synonymous terms.   Until detached or separated from the shares whose value it enhances, increase forms part of that value, and, therefore, part of the shares ; and if it be part of the shares themselves then, whilst it may be *profit*, it is in no sense income.   And this has been distinctly adjudged by the Court of Appeal of England.   *In re Armitage*, 3 Ch. 337, (1893.)   In that case it appeared that a testator gave his estate upon trusts for conversion and investment.   He bequeathed one-third of the residue to the trustees for the benefit of A. for life and after her death upon further and other trusts.   Part of the residue consisted of £10 shares in a company with £8 per share paid up.   Some years after the testa-

tor's death the company was wound up and reconstituted, and the new company paid for the testator's shares £9 5s. 6½d. each, being £1 5s. 6½d. per share more than had been paid up. The question was : Did this £1 5s. 6½d. per share constitute income to which the tenant for life was entitled, or was it capital ? LINDLEY, L. J., said : "In this case I do not feel much difficulty. * * * * The question we have to determine is, who is entitled to the sum of £1 5s. 6½d. per share upon 4,450 shares which belonged to the estate of the testator, those shares being shares in a company which was wound up and reconstituted ? We must first look to the testator's will. * * * * The short effect of that will is this—one-third part of these shares is held by trustees upon trust to pay the income to the tenant for life and subject thereto in trust for the remainder-man. Now, is this £1 5s. 6½d. income within the meaning of that trust ? How does this £1 5s. 6½d. per share arise ? It arises in this way. The shares were £10 shares with £8 paid up upon them. The company was wound up and the assets of the company were distributed amongst the registered shareholders, and each registered shareholder got £9 5s. 6½d. instead of £8—that is to say, upon the distribution of the assets, there was an excess of £1 5s. 6½d., whether profits or capital I will not at present say, over the £8 paid up in respect of each share. It arose apparently in this way : The assets of the company consisted among other things of about £20,000 standing to a reserved dividend fund, and of £17,000 standing in the books of the company and representing undivided profits in addition to the reserved dividend fund. Those undivided profits, of course, could have been divided as dividends if the company had so thought fit. The £20,000 was applicable to the equalization of dividends. The moment the company got into liquidation there was an end of all power of declaring dividends and of equalizing dividends, and the only thing that the liquidator had to do was to turn the assets into money, and divide the money among the shareholders in proportion to their shares. That is what he has done.

"Now, there has been a great discussion about the nature of this £1 5s. 6½d. as to whether it is capital or income, and whether it is profit. I should say it is profit. When a person gets out of a concern more than he puts into it the difference is profit. If I put £100 into a concern and get out £105, I get £5 profit. In that sense of the word, this £1 5s. 6½d. is profit, being the excess of the money produced by the sale of the investment over the amount of money invested. But is it income to which the tenant for life is entitled? That is a totally different matter, and I say that it clearly is not. What does a man mean when he leaves shares to a tenant for life? He means that that tenant for life shall have the income arising from the shares in the shape of dividends or bonuses declared during the lifetime of the tenant for life. He does not mean that the tenant for life shall receive profits in any other sense. He does not mean him to have such profits for example, as arise by a realization of shares; he never dreamed of such profits going to the tenant for life. What he means is, that the tenant for life shall have the income derived from the dividends or bonuses declared by the company; and when you ask me whether this £1 5s. 6½d. is income payable to the tenant for life, it seems to me as plain as possible that it is not, although it is profit in the sense I have just explained. * * * * * * * It is true that this property has never been capitalized by the company, neither has it ever been declared as a dividend or bonus by the company; the company has not dealt with it in either one shape or another. But when you come to ask yourself whether it is to go to the tenant for life or to the remainder-man, there can be but one answer—it is to go to the remainder-man."

Precisely the same principle is applicable when the trust fund has been invested by the trustees in stock or shares of an incorporated company, and has not come to them already invested by the testator. If the value of such shares in which the trustees have invested the trust fund, consists in part of accumulated surplus or undivided earnings, the additional value is part of the capital and together with the par value

of the shares must be kept intact for the benefit of the re-
mainder-man. *Van Doren* v. *Olden*, 19 N. J. Eq. 176, cited
with approval, though not to this precise point, in *Thomas* v.
*Gregg*, 78 Md. 555.

The case of *Heighe* v. *Littig*, 63 Md. 301, decides nothing
more than that the income or profits derived from the testa-
tor's share of capital in a partnership, which partnership by
the terms of the articles was to continue after his death, be-
longed under his will to the life tenant and did not constitute
a part of the *corpus* of the decedent's estate. But that case has
no relation to the question as to who is entitled to an increase
in the value of the investment which produces the income.

Whilst from quite an early period it has been held in this
State that the gift or bequest of a female slave to one for life
with remainder over to another, vested in the life tenant an
absolute property in the issue of such slave born during the
continuance of the life estate, yet when it came to the ques-
tion whether the life tenant was entitled to such issue where
the slave and other property, real and personal, had been
devised and bequeathed to trustees and the life tenant was
given the income arising therefrom, with remainder over to
others, the Chancellor held that the increase—the issue of
the slave—belonged not to the life tenant as income, but was
the property of those in remainder. *Holmes* v. *Mitchell*, 4
Md. Ch. Dec. 162. This decree was affirmed on appeal by a
divided Court. *Holmes* v. *Mitchell*, 4 Md. 532.

If, by the terms of Mr. Hooper's will, the life tenant had
been given not only the dividends and income, but also the
*profits* arising from an investment of the trust fund, a differ-
ent question might and probably would have been presented.
The case of *In re Park's estate*, 173 Pa. St. 190, 33 Atl. Rep.
884, illustrates this. In that case the main question was what
things, under the facts, properly constituted "income and
profits" and what "principal." The excess over and above
the original trust fund, realized by the trustees on the sale of
mortgaged premises previously bought in to protect the fund,
was decreed to belong to the *cestui que trust*, because that

excess constituted "income and profits," and the *cestui que trust* was entitled to both income and profits within "the purpose and intent" of the testator's will.

Inasmuch, then, as whatever of value there is in the shares of stock in which the original trust fund was invested and reinvested is, so far as the record discloses, inherent in the stock itself and has not been segregated from the stock in any way; it must be held to form part of the trust fund, and, therefore, to belong to the trustees and not to the *cestui que trust*, except as hereinafter indicated. This is the result reached by the Circuit Court No. 2, and with that conclusion we concur.

Now, as to the second appeal. The $2,744.93 of cash turned over to the trustees by Mrs. Smith was her own property. It was invested by the trustees along with a portion of the trust funds in the stock of the Tri-State Can Company. The whole fund so invested grew in value. The cash and stock received by the trustees from the American Can Company in exchange for the 360 shares of the Tri-State Can Company represent the whole ten thousand dollars invested in the shares of the latter concern. As a part of that ten thousand dollars belonged to Mrs. Smith, so a part of the Tri-State Can Company's stock belong to her, and, of course, a part of the cash and a part of the common and preferred stock received in exchange from the American Can Company likewise belongs to her. She is accordingly entitled out of the $16,500.00 cash received from the American Can Company and out of the $4,705.89 realized by a sale of 180 shares of the common stock and out of the 180 shares of preferred stock still held, to such and the same proportion as the $2,744.93 contributed by her bears to the whole $10,000 invested in the stock of the Tri-State Can Company, less a due proportion of the costs and expenses of these proceedings. This is also the conclusion reached by the Circuit Court and as we concur in it, it will be affirmed.

> *Decree affirmed in all respects, the costs in this Court to be paid out of the trust fund ratably.*

(Decided April 2nd, 1902.)

A motion was subsequently made by the appellant, Mrs. Smith, to remand the cause to the Court below for an amendment of the pleadings and for further proceeding. In disposing of the motion

McSHERRY, C. J., delivered the opinion of the Court.

This cause was argued and decided during the last January Term. The questions involved in the controversy were presented by a bill in equity and by an answer thereto. The facts were not disputed. On the contrary, they were distinctly agreed to. Accepting as true the averments of the bill which were admitted by the answer—and all the material ones were admitted—we proceeded to decide and did decide the legal questions raised, discussed and submitted. After the judgment of this Court had been handed down a motion was filed, asking this Court to remand the cause for amendment of the pleadings and for further proceedings. That motion will now be considered.

In the petition accompanying the motion it is stated that the facts which should have been presented but were not, are wholly and radically different from those set forth in the bill and answer, and relied on in the decision heretofore made ; and it is asserted that if the appellant be given an opportunity to submit the actual facts in place of those erroneously assumed in the pleadings to be true, the result would be precisely the reverse of the one heretofore announced. We are, therefore, asked to remand the case to the Court below, notwithstanding we have affirmed the decree appealed against, so that the pleadings may be amended in such a way as to present an entirely different and exactly opposite state of facts. In a word the request is, that instead of affirming the decree, the accuracy of which, on the facts disclosed as they now stand by the admission of the parties, is not at all disputed, we remand the record with instructions to allow the parties to so amend the pleadings as to make a totally different case from the one they originally presented. The ground upon which this request is placed is, that the case was "a non-contentious

one''—that is a case which did not involve a hostile contest as respects the facts, because the facts were conceded. It is insisted that inasmuch as facts were conceded which ought not to have been conceded because in reality they did not exist, the appellant should not be bound by the concession after the decision has been adverse to her, but that she should be allowed to withdraw that concession now and should be permitted to assert and rely on precisely opposite facts.

Have we the power to do this ? *Sec. 36, Art. 5 of the Code* declares : "If it shall appear or be shown to the Court of Appeals that the substantial merits of a cause will not be determined by the reversing or affirming of any decree or order that may have been passed by a Court of equity, or that the purposes of justice will be advanced by permitting further proceedings in the cause, either through amendment of any of the pleadings or the introduction of further evidence, making additional parties, or otherwise, then the Court of Appeals, instead of passing a final decree or order, shall order the cause to be remanded to the Court from whose decision the appeal was taken, and thereupon such further proceedings shall there be had by amendment of the pleadings, or further testimony to be taken, or otherwise, as shall be necessary for determining the cause upon its merits, as if no appeal had been taken in the cause, &c."

It must be borne in mind that this Court has no original jurisdiction. Its functions are purely appellate. If the statutes do not give jurisdiction to hear a case except upon the record as transmitted, then it is obvious that this Court has no power to inspect documents or to consider evidence with a view to determine whether facts stated in the record to be facts, are facts or simply fiction. To decide whether conceded facts are facts, is to determine, not what is the law applicable to the conceded facts, as was done by the Court below and by this Court, but to investigate a distinctly new question not raised by the record and not suggested in the Court below. We declined to do this very thing in *Stanley* v. *Safe Deposit Co.*, 87 Md. 458–9; *Rogers, Brown & Co.* v.

*Citizen's Bank,* 93 Md. 618.    We have been furnished no reference to any adjudged case which holds that this Court after deciding a case on record sufficiently full and explicit to justify the rendition of a final decree, can go into an investigation, outside of the record, to ascertain whether the facts contained in the record and upon which the decision was based, were in reality true.    In the very nature of things such a power could not exist, because it would involve an independent investigation and would require this Court to decide, as a Court of first instance and upon evidence adduced before it, an issue of fact not embraced in the record of the case.    The exercise of such a power might and most probably would in some proceedings necessitate the summoning and examination of witnesses to determine whether the conceded facts *were* facts ; and this Court has no jurisdiction to do any such thing.    *Lenderking* v. *Rosenthal,* 63 Md. 38.    After the case just cited had been finally decided a motion was filed asking for a modification of the decree of reversal and certain allegations of fact were made in support of the motion.    Those facts, if they existed, were not disclosed by the record.    The appellant answered the application and denied the averments of fact.    In overruling the motion and in declining to remand the cause under *sec. 28,* now *sec. 36, Art. 5 of the Code,* this Court said : "It is manifest, therefore, upon the allegations thus made by the respective parties, that questions for the exercise of original jurisdiction are presented, which this Court, as an appellate tribunal, cannot hear and decide.    Such questions must be presented to and be passed upon by the Court below, having cognizance of the proceedings.    In the manner in which they are presented here, we can express no opinion in regard to them, not being embraced in the appeal which we have decided."    If this Court is without authority to make such an investigation so as to enable it to determine whether a case after having been decided shall be remanded with a view to being amended in a way to present precisely opposite facts ; it is equally without authority to remand the record for a similar amendment merely upon the *ex-parte* application of the

unsuccessful litigant.    This Court cannot pass an order send-
ing the record back so that the pleadings may be amended,
simply upon the *allegation* that the conceded facts are wrong,
when it has no power to ascertain by the aid of evidence
whether the allegation of error is correct.    To hold the
contrary would be tantamount to deciding that though we
were without jurisdiction to investigate the truth of conceded
facts, we yet have jurisdiction to act upon a simple allegation
that the conceded facts were not true.    Where would such a
doctrine lead ?    It will not do to say that the doctrine is con-
fined to cases where the facts are admitted by the pleadings ;
because there is no difference between such an admission and
one made in an agreed statement of facts, or in a case stated.
If the doctrine is a sound one at all it is applicable to every
case in which a decision has been rendered upon a state of
facts honestly believed to exist but subsequently doubted, dis-
puted or discovered not to exist.    Litigation would be greatly
protracted by the adoption of such a doctrine. Each decision
of the same case might develop some new feature that would
furnish the ground for an additional amendment and the con-
test would be drawn out by successive applications for re-
manding with a view to other amendments.

Returning to the language of the statute it is apparent that
the Code contemplates an entirely different situation from the
one now being dealt with.    Whenever it shall appear or be
shown to the Court of Appeals ( *first*), that the substantial
merits of a cause will not be determined by affirming or re-
versing a decree, or ( *secondly*), that the purposes of justice
will be advanced by permitting further proceedings, then and
in either of these events, the Court of Appeals "*instead of
passing a final decree or order,*" shall remand the cause, &c.
Such a remanding if made must be made *before* final decree
and *because* a final decree cannot be passed on the record as it
stands without doing injustice.    In addition to this, such a
remanding is allowed only when it appears or is shown to the
Court *by the record in the case* either that the substantial merits
of the case will not be determined by an affirmance or a re-

versal, or, that the purposes of justice will be advanced by permitting further proceedings. In *Genl. Ins. Co.* v. *U. S. Ins. Co.*, 10 Md. 528, it was said : "But the record must indicate that the ends of justice will be promoted by such further proceedings, in order to authorize this Court to remand a cause." Neither of the above-named alternatives will warrant the striking out of a final decree in order to let in a remanding so that an entirely new and different case may be made by amendment. And so this Court has flatly held. *Benscotter* v. *Green*, 60 Md. 333. Indeed a plaintiff is not at liberty to abandon the entire case made by his bill and to make a new and different case by way of amendment. *Bannon* v. *Comegys*, 69 Md. 422. The *36th sec. of Art. 5 of the Code* was taken from the *Act of 1832, ch. 302, sec. 6,* and has been adverted to—sometimes applied and sometimes not—in sixty-four cases, beginning with *Kent* v. *Taneyhill*, 6 G. & J. 1 and ending with *Rogers, Brown & Co.* v. *Citizens Bank*, 93 Md. 618–19; and in not one of those sixty-four cases covering a period of seventy years during which the *Act* of 1832 has been in force, was an application made like the one now being considered. The nearest approach to the pending motion will be found in *Paine* v. *France*, 26 Md. 46, and that application was refused.

We do not perceive how the circumstances now relied on, even if proved, would change the conclusion heretofore reached, unless the authority of the case of *In re Armitage*, 3 Ch. (1893) 337, be repudiated. But we refrain from discussing a situation which is not before us, though we may add that a resolution adopted by the directors of the R. Tynes Smith Company subsequently to the decision of this cause and considerably more than a year after the company went out of existence, can have no influence on any of the questions considered and decided heretofore, or on any of those raised by the motion now under review.

It is unfortunate if the appellant misconceived the facts in the first instance, but the appellees deny that there was any such misconception. They assert that the facts alleged in

the bill and admitted by the answer are true. Thus a distinct issue is presented by the motion and the answer thereto, and it is an issue which this Court has no jurisdiction to decide.

For the reasons assigned the motion must be overruled.

*Motion overruled.*

(Decided June 19th, 1902.)