## POWELL et al. v. MARYLAND TRUST CO.
### No. 4865.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1942.

SOPER, Circuit Judge, dissenting.

———◆———

W. R. C. Cocke, of Norfolk, Va. (Harold J. Gallagher, of New York City, and Geo. V. Credle, Jr., of Norfolk, Va., on the brief), for receivers of Seaboard Air Line Ry. Co.

Irwin L. Tappen, of New York City (Baird, White & Lanning, of Norfolk, Va., Humes, Buck, Smith & Stowell and Albridge C. Smith, all of New York City, and George M. Lanning, of Norfolk, Va., on the brief), for appellants and cross-appellees New York Trust Co., and another.

William A. Graham and Carlyle Barton, both of Baltimore, Md. (Theodore Garnett, of Norfolk, Va., and Edward Duffy, of Baltimore, Md., on the brief), for appellee and cross-appellant.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

These are appeals in a three-sided controversy which has arisen in the receivership of the Seaboard Air Line Railway Company, with relation to a stock dividend and certain cash dividends on stock owned by the Seaboard in the Richmond-Washington Company and pledged with the predecessor of the Maryland Trust Company, as trustee. This stock, 4,450 shares in amount, was pledged in 1901 by the corporation to whose rights the Seaboard succeeded with the Continental Trust Company, predecessor of the Maryland Trust Company, as trustee under a first mortgage executed to secure a bond issue. On October 18, 1930 a 50% stock dividend was declared on this stock; and on October 31, 1930, certificates for 2,225 shares were delivered to the Seaboard as the stock dividend on its shares. On December 23, 1930, receivers were appointed for the Seaboard, and the certificates representing the stock dividend passed into their possession. The receivers collected cash dividends on the original shares of stock up to January 4, 1932, and on the stock dividend shares up to the time of the decree of the court below.

The Maryland Trust Company, the trustee under the first mortgage, claims both the stock dividend and the total of the cash dividends by virtue of the rights vested in it by the pledge of the original shares of stock under the first mortgage. The receivers deny the right of the first mortgage trustee to either the stock dividend or the cash dividends, claim a lien on both under the order appointing receivers and also under the orders authorizing issuance of receivers' certificates and assert that any rights of the first mortgage trustee have been lost by waiver and estoppel. The New York Trust Company joins the receivers in denying the right of the first mortgage trustee to the shares of stock represented by the stock dividend and also to the cash dividends paid thereon, but claims for itself these shares of stock and cash dividends under the terms of a refunding mortgage executed by the Seaboard.

The controversy was referred by the court below to the late J. E. Heath, as

special master, who in an able and comprehensive report found for the first mortgage trustee both as to the stock dividend and the total of the cash dividends claimed. This report was affirmed by the judge in all respects, except as to a cash dividend of $20,025 paid December 31, 1930, which he held to belong to the receivers. From this decree all parties have appealed; and in the view which we take of the case four questions are presented for our determination, viz.: (1) Did the stock dividend on the Richmond-Washington stock belong to the first mortgage trustee? (2) Was the first mortgage trustee entitled to the cash dividends mentioned, including the $20,025 paid December 31, 1930? (3) Were the receivers vested with a lien upon either the stock dividend or the cash dividends by the order appointing receivers or the orders authorizing issuance of receivers' certificates? (4) Have the rights of the first mortgage trustee with respect either to the stock or the cash dividends been lost by waiver or estoppel? We think that the first two of these questions should be answered in the affirmative and the last two in the negative. We shall consider them separately and in the order named. The answers to the first two questions render it unnecessary to consider a number of subsidiary questions arising in connection with the contentions of the New York Trust Company.

### 1. The Stock Dividend.

The Seaboard Air Line was one of six railroads which owned in equal shares the stock of the Richmond-Washington Company, a holding company which owned the Richmond Fredericksburg & Potomac Railroad, over which the trains of the Seaboard are operated between Richmond and Washington. It originally held 4,450 shares of this Richmond-Washington stock, which in the year 1901 it pledged with the Continental Trust Company, predecessor of the Maryland Trust Company, as trustee under a first mortgage to secure a bond issue. The stock is not expressly mentioned in the mortgage, which provides, however, for the pledging of stocks, bonds and other property to the trustee to be held subject to the terms of the mortgage. Section 1 of article III of the mortgage contains the following provision: "Unless (a) the 'Railroad Company' shall be in default in the payment of some interest upon any of the bonds secured by this indenture, or on any of said outstanding divisional bonds (other than bonds held by the 'Trustee' hereunder), and such default shall have continued for a period of six months; or unless (b) the 'Railroad Company' shall be in default in the due and punctual payment of the principal of any bond secured hereby, or of any of said outstanding divisional bonds hereinbefore mentioned; or unless (c) the 'Railroad Company' shall be in default in the payment of any tax, assessment or other governmental charge lawfully imposed or levied upon any part of the property and premises hereby mortgaged, or the income and profits thereof, and such default shall have continued for a period of six months, after written notice thereof from the 'Trustee,' or from the holders of five per cent in amount of the bonds secured hereby; or unless (d) the 'Railroad Company' shall be in default in the due performance and observance of any covenant or condition of this indenture, and such default shall have continued beyond the period of grace, if any, herein provided for, in respect of such default, and the 'Trustee' shall have entered, or shall have elected to enter, into possession under the power of entry hereinafter conferred; or unless (e) the 'Railroad Company' voluntarily shall have surrendered to the 'Trustee' possession of the mortgaged premises as hereinafter authorized—the 'Trustee' (except with the assent of the 'Railroad Company') shall not collect or be entitled to collect the interest of any of the bonds or claims or indebtedness now or hereafter pledged with or assigned to the 'Trustee' under this indenture, and the 'Railroad Company' shall be entitled to receive all interest paid or dividends declared in respect of any bonds or stocks transferred to or pledged with the 'Trustee' pursuant to any of the provisions of this indenture, * * *."

On September 18, 1930 the Board of Directors of the Richmond-Washington Company voted a stock dividend of 50%, payable in stock October 31, 1930; and on the last named date certificates evidencing 2,225 shares of the capital stock of the company were delivered to the Seaboard as stock dividend on the 4,450 shares which it held and which it had pledged with the first mortgage trustee. Receivers were appointed for the Seaboard on December 23, 1930, and these certificates, of which the first mortgage trustee had no notice or knowledge until some time later, passed into their possession. The evidence shows

that the earnings of the Richmond-Washington Company which justified the declaration of the stock dividend accrued subsequent to the pledge of the stock with the first mortgage trustee. It shows, also, what is to be expected in such cases, that immediately following the stock dividend the total book value of the original shares plus the shares issued as stock dividend was precisely the same as the book value of the original shares immediately prior to the dividend. The book value of each of the shares of stock immediately prior to the stock dividend was $263.75, immediately after the dividend, $175.83.

■ The mortgage was delivered to the first mortgage trustee and accepted by it in Baltimore, Md., and the shares of stock which were pledged were delivered to it there; and there is no serious question but that the law of Maryland is the law properly applicable in determining the rights of the parties with respect to the stock dividend.

■ In the absence of the provision of the mortgage quoted above, there could be no question but that the shares of stock issued as stock dividend would go to the first mortgage trustee, as pledgee of the original shares of stock, to be held by it under the terms of the pledge. Gemmell v. Davis, 75 Md. 543, 23 A. 1032, 32 Am. St. Rep. 412; Railroad Credit Corp. v. Hawkins, 4 Cir., 80 F.2d 818; Jones on Collateral Securities, 3d Ed., sec. 298. The question involved, therefore, is the interpretation of the word "dividends" as contained in the provision under which "dividends" were reserved to the. Seaboard, i.e. was the reservation to the Seaboard of the right to "dividends" until default under the mortgage intended to reserve to it the right to stock dividends? We think the answer to this must be in the negative, both because a contrary interpretation would be unreasonable in the light of surrounding circumstances, and because, even in the absence of such circumstances, a stock dividend is not ordinarily included in the term "dividends" as contained in a contract relating to dividends, in the absence of a clear indication that it was intended that they should be so included.

It must be remembered that the Richmond-Washington stock pledged by the Seaboard with the first mortgage trustee represented a one-sixth interest in the railroad over which the trains of the Seaboard between Richmond and Washington were operated; and the fair inference is that it was intended that this interest in the road was to remain pledged with the trustee as security for the bonds. Cash dividends on the stock, i. e. amounts paid in cash to stockholders from the earnings of the corporation, were to be enjoyed by the Seaboard so long as it was not in default; but it is hardly to be supposed that the parties could have intended that the Seaboard should have free of the pledge a stock dividend representing a mere capital readjustment, and that the proportionate interest of the first mortgage trustee in the property represented by the stock which had been pledged with it should be thus reduced. The fact that the mortgage contained specific provision that "consolidation, merger, sale or lease" of any company whose stock was pledged with the first mortgage trustee might be made only "upon such terms as shall not in any manner impair the value of the security hereunder" (art. III sec. 6) shows a clear intention that the value of the security pledged should not be impaired by corporate manipulation. And nothing to the contrary is to be inferred from the anti-dilution clause of article II section 8 of the mortgage. Provision was made therein for the preservation of rights in the properties of constituent companies, the majority of whose stock had been assigned to the trustee; but this does not in any way indicate an intention that the rights of the trustee in properties represented by other stocks pledged might be decreased by allowing the Seaboard to have free of pledge stock dividends which might be declared with respect thereto. If any inference is to be drawn from this anti-dilution clause, it is favorable to the position of the first mortgage trustee rather than otherwise.

■ And quite apart from the peculiar circumstances of the case, which show very clearly, we think, that stock dividends were not intended to be included among the "dividends" reserved to the Seaboard by the terms of the mortgage, the rule is well settled that the word "dividends" in contracts relating to the sale or transfer of stocks is not ordinarily to be construed as embracing stock dividends, which are not true dividends at all but a mere certified expression of an undivided surplus and its capitalization. Eisner v. Macomber, 252 U.S. 189, 210, 211, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. The precise question is not covered by any Maryland decision;

but it is worthy of note that in the case of Smith v. Hooper, 95 Md. 16, 51 A. 844, 846, 54 A. 95, Chief Judge McSherry quotes with approval from Spooner v. Phillips, 62 Conn. 62, 24 A. 524, 16 L.R.A. 461, that "the word 'dividend,' if unqualified * * * signifies dividends payable in money". Mr. Justice Gray, speaking for the Supreme Court in Gibbons v. Mahon, 136 U.S. 549, 10 S.Ct. 1057, 1059, 34 L.Ed. 525, thus states the essential nature of a stock dividend: "A stock dividend really takes nothing from the property of the corporation, and adds nothing to the interests of the shareholders. Its property is not diminished, and their interests are not increased. After such a dividend, as before, the corporation has the title in all the corporate property; the aggregate interests therein of all the shareholders are represented by the whole number of shares; and the proportional interest of each shareholder remains the same. The only change is in the evidence which represents that interest, the new shares and the original shares together representing the same proportional interest that the original shares represented before the issue of new ones."

And the distinction between the essential character of an ordinary dividend and a stock dividend is thus drawn in the opinion of the lower court in Gibbons v. Mahon, 4 Mackey 130, 136, 54 Am.Rep. 262, quoted with approval by Mr. Justice Gray in the Supreme Court: "Certificates of stock are simply the representative of the interest which the stockholder has in the capital of the corporation. Before the issue of these two hundred and eighty new shares, this trustee held precisely the same interest in this increased plant in the capital of the corporation, that she held afterwards. She merely had a new representative of an interest that she already owned, and which was not increased by the issue of the new shares. *A dividend is something with which the corporation parts, but it parted with nothing in issuing this new stock.* It simply gave a new evidence of ownership which

already existed. They were not in any sense, therefore, dividends for which this trustee had to account to the cestui que trust. She stood, after the issue of the new shares, just as she had stood before; and the trustee was obliged to treat them just as she did, namely, as a part of the original, and to pay the dividends to the cestui que trust." (Italics supplied).

A stock dividend is not a true dividend because not involving a severance of corporate assets for distribution to stockholders, but is in its last analysis a mere incident or process of corporate bookkeeping. 18 C.J.S., Corporations, § 466, p. 1110. The word "dividend", when used without qualification or explanation, ordinarily signifies dividends paid in money. 13 A.J. p. 640. It involves a severance from corporate assets of an amount distributed to stockholders, but the stock dividend involves no such severance or distribution of assets. As said by the Supreme Court in Eisner v. Macomber,[1] supra, 252 U.S. 189, 211, 40 S.Ct. 189, 194, 64 L.Ed. 521, 9 A.L.R. 1570: "A 'stock dividend' shows that the company's accumulated profits have been capitalized, instead of distributed to the stockholders or retained as surplus available for distribution in money or in kind should opportunity offer. Far from being a realization of profits of the stockholder, it tends rather to postpone such realization, in that the fund represented by the new stock has been transferred from surplus to capital, and no longer is available for actual distribution."

In McDonald v. Maxwell, 274 U.S. 91, 47 S.Ct. 497, 499, 71 L.Ed. 942, the Supreme Court refused to allow executors in the District of Columbia commissions on stock dividends, on the ground that such dividends represented no increase in the principal of the estate in their hands, saying: "It is apparent, in the light of these decisions, that the stock dividends received by the executors represented no real increase in the principal of the estate during the accounting period. They merely

---

[1] There is nothing to the contrary in such cases as Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268, 105 A.L.R. 756, and United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L. Ed. 180, which hold that, for purposes of taxation, distinction must be drawn between a stock dividend which, like the one here involved, works no change in the corporate entity, the same interest in the same corporation being represented after the distribution by more shares of precisely the same character, and a stock dividend which involves changes of corporate identity or a change in the nature of shares issued, whereby the proportional interest of the stockholder after distribution is essentially different from his former interest.

changed the form of the estate's investment in the corporate stocks by increasing the number of its shares, but left the aggregate value of all its shares the same as that before the dividend shares were issued. After their issuance, which necessarily 'diluted' the value of the original shares, the dividend shares and the original shares together represented the same proportional interest in the corporate properties that had previously been represented by the original shares alone; no more and no less."

In a controversy arising between a life tenant and remainderman as to the right to a stock dividend, the Supreme Court of Missouri, in Hayes v. St. Louis Union Trust Co., 317 Mo. 1028, 298 S.W. 91, 98, 56 A.L.R. 1276, 1285, a well considered decision, puts the matter thus: "A stock dividend is not in any true sense a dividend at all. The latter implies a division, a severance from the corporate assets of the subject of the dividend, and a distribution thereof among the stockholders. McLaran v. Crescent Planing Mill Co., 117 Mo.App. 40, 93 S.W. 819; 14 C.J. p. 798; 5 Thompson on Corporations 2d Ed. p. 84, § 5270. The issuance of a stock dividend is, in its last analysis, nothing more than an incident or process in corporation bookkeeping. The important step is the increasing of the fixed capital of the corporation. The outstanding shares of stock are increased to balance, either by adding to their number or raising their par value. When the stock has no par value, it seems even this is unnecessary. Nothing is taken from the corporation. Nothing is given to the stockholders, rather the contrary, for corporate profits theretofore available for distribution in dividends are permanently appropriated to its fixed capital. The title to all corporate property remains in the corporation as before. The proportional interest of each stockholder continues the same; the only change is in the evidence of his interest in the corporation—that is, the number of his shares of stock is increased and the book value of each share correspondingly decreased, or the face value of his shares of stock is raised to or toward what their intrinsic value was before."

A case directly in point here, because dealing with a reservation of dividends, is Lancaster Trust Co. v. Mason, 152 N.C. 660, 68 S.E. 235, 236, 136 Am.St.Rep. 851. In that case an offer to sell corporate stock, which was accepted, contained the following expression, "allowing the January dividend to us". A stock dividend of 50% and a regular cash dividend of 4% and an extra cash dividend of 6% were declared in January. The Supreme Court of North Carolina held that both cash dividends were retained by the seller under this provision of the contract, but that the stock dividend went to the purchaser with the stock purchased. The court, citing the Maryland case of Smith v. Hooper, supra, said: "Upon a careful review of the correspondence between the parties and a further consideration of the case we are led to the conclusion that the words 'allowing the January dividend to us,' used in plaintiff's letter of December 23, 1907, were intended to refer to dividends payable in cash only, and do not embrace the so-called 'stock dividend' of 50 per cent. That was not strictly or in the usual sense of the word a dividend. It was simply an increase in the capital stock by dividing the capital of the corporation into a larger number of shares and allotting them to each stockholder in proportion to the number of shares he owned before the increase. This is not infrequent in these days when 'watering stock' is no uncommon occurrence; not that we mean to intimate that such has been the case here. *Therefore it has been held that where the word 'dividend' is used without qualification or explanation, it signifies dividends payable in money:* 14 Cyc. 554, and cases cited; Black, Law Dict.; 3 Words & Phrases [First Series] pp. 2143, 2144; Smith v. Hooper, 95 Md. 16, 51 A. 844, 54 A. 95." (Italics supplied)..

Kaufman v. Charlottesville Woolen Mills Co., 93 Va. 673, 25 S.E. 1003, 1004, was another case in which dividends on stock sold were retained by the seller. In holding that the word dividends did not include a stock dividend, the court said: "In the case at bar it is clear, on reason and authority, that the proper construction of the contract between the parties is that Kaufman retained to himself whatever dividend was declared in January, 1896, as the ordinary and usual fruit of the investment he was parting with. This he received when the cash dividend of 10 per cent. declared for the stockholders was paid to him. The stock dividend of 27 per cent. represented part of the corporate property sold to Hotopp, in which Kaufman reserved no interest, and was therefore not entitled to the whole or any part thereof."

See, also, Thompson on Corporations vol. 5, 5271; Towne v. Eisner 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372, L.R.A.1918D, 254;

United States v. Siegel, 8 Cir., 52 F.2d 63; Staats v. Biograph Co., 2 Cir., 236 F. 454, L.R.A.1917B, 728; Wall v. Utah Copper Co., 70 N.J.Eq. 17, 62 A. 533; Georgia Power Co. v. Watts, 184 Ga. 135, 190 S.E. 654, 110 A.L.R. 465, 470; Booth v. Gross, Kelly & Co., 30. N.M. 465, 238 P. 829, 41 A.L.R. 868; note L.R.A.1917B, p. 736.

In the light of these authorities as well as of the circumstances surrounding the transaction, we think there can be no doubt but that the reservation of dividends on the stock pledged should be construed not to include the stock dividend, and that this should go, under the general principles of the law relating to pledges, as recognized in Maryland, to the first mortgage trustee as an essential part of the thing pledged with it. As was well said by the able special master in his report to the court below: "I think that, upon principle, and in view of the meaning of the word *dividend* in Maryland, where the first mortgage became effective, as well as generally elsewhere, and especially in the States of Virginia and North Carolina, under the laws of which Seaboard No. 1 was incorporated, the first mortgage trustee's position is sound. It will not do to say that this stock dividend represents *only* profits. It represents profits *automatically turned into stock*—stock which is not only capable of earnings far in excess of the ordinary return on investments, but which depletes to the extent of one-third the trustee's original holding. * * * By consenting to waive its dividends, it (the trustee) did not consent that the *principal* of its security should be impaired, save to the extent that the payment of cash dividends would necessarily reduce the assets of the R-W Co. It has never consented that the one-sixth stock interest pledged to it should be reduced, which reduction would automatically result from giving the stock dividend in question to the railway, or to its successors, the receivers, or to the refunding mortgage trustee."

The only argument against this position is based upon certain Maryland decisions, beginning with Thomas v. Gregg, 1894, 78 Md. 545, 28 A. 565, 44 Am.St. Rep. 310, to the effect that under a trust giving the income of property to a person for life with provision that the principal be paid to others upon his death, dividends, whether in stock or in cash, to the extent that they represent profits arising subsequent to the creation of the trust, will be distributed to the life tenant as income of the trust estate. We note in passing, that the rule of these decisions has been changed by statute in Maryland, as it has in New York. See Flack's Annotated Code of Maryland, art. 75B, sec. 5. The rule, however, does not solve our problem; for the question with which it deals is, not the nature of dividends and what is to be included within the term, but the nature of corporate income and how it should be apportioned between life tenant and remainderman under a trust, the rule being applicable to true dividends paid in cash as well as to stock dividends representing capitalization of corporate surplus. No such question is presented here. There is no reservation of income to the Seaboard. Only dividends are reserved; and, as to these, there is no question as to who is entitled to them, once they are found to be dividends within the meaning of the reservation. Upon this question the rule as to apportionment of income of corporate stocks between life tenant and remainderman manifestly cannot be determinative; for that rule, as applied to stock dividends, does not mean that stock dividends are to be. treated in all respects as cash dividends, but merely that, when corporate income is capitalized and stock certificates are issued evidencing the capitalization, a life tenant entitled to the income of the trust property is entitled to the certificates. Since it is not income but dividends which is reserved to the Seaboard, our problem is to decide, not what is properly included in income, but what is properly included in "dividends"; and to the proper solution of this problem more helpful than the cases dealing with trusts for life tenants and remaindermen is what was said in the case of Smith v. Hooper, supra, 95 Md. 16, 51 A. 844, 54 A. 95, holding that an increase in the value of the corpus of an estate resulting from trading on the part of the trustees did not constitute either "dividends" or "income" to which the life tenant was entitled under the Maryland rule. In distinguishing Thomas v. Gregg, supra, and a number of other cases, Chief Judge McSherry said: "Those cases mainly determine, not what is income or what are dividends, but to whom income and dividends, confessedly such, belonged. In the case at bar there is no dispute as to who is entitled to this increase if it be income or dividends, but the question is, does that increase consti-

tute income or dividends at all? Obviously, therefore, the cases just referred to have no direct bearing upon this investigation. 'The word "dividend", if unqualified,' said the supreme court of errors of Connecticut, 'signifies dividends payable in money. The word "income" has a broader meaning, but hardly broad enough to include things not separated in some way from the principal. It is not synonymous with "increase." The value of stock may be increased by good management, prospects of business, and the like, but such increase is not income. It may also be increased by an accumulation of surplus; but so long as that surplus is retained by the corporation, either as surplus or increased stock, it can, in no proper sense, be called "income." It may become producing, but it is not income.' Spooner v. Phillips, 62 Conn. 62, 24 A. 524, 16 L.R.A. 461. Surplus and accumulated reserve funds, until set apart and appropriated by the corporation for the payment of dividends, are capital, and, whatever their magnitude may be, they are not, as between life tenant and remainder-man, treated as income until they are distributed. Gibbons v. Mahon, 136 U.S. 549, 10 S.Ct. 1057, 34 L.Ed. 525."

It is true that the presumed intention of the creator of the trust that the life tenant should have the income of the trust property lies at the basis of the former Maryland rule for apportionment of dividends; and, of course, if any intention that the Seaboard should have the increment in the value of the property represented by the pledged shares of stock could be spelled out of the reservation in the mortgage, there would be reason in the position that the stock dividend was intended to be included in the reservation of dividends. But no such intention can be found either in the mortgage itself or in the surrounding circumstances. As indicated above, it is more reasonable to assume that the intention of the parties was that the Seaboard, in the absence of default, should have paid to it the cash dividends declared on the stock, but that, except for these, the one sixth interest in the R-W Company represented by the stock should remain as security for the bonds, without impairment or diminution as the result of stock dividends or other book-keeping devices of that character. As was well said by the special master in his report to the court below: "But because a court would adopt such a rule as this in order to protect a life tenant, it does not follow that it regarded a stock dividend as a real dividend —especially when, as in the case of the Maryland court, it had expressly said that such a dividend was not a real dividend. And because a court might think it would be just to give such a dividend to the life tenant rather than to the remainderman, in order to prevent the former from being prejudiced by the refusal of a corporation to declare cash dividends, it does not follow that it would consider it just to give it to a pledgor as against a pledgee, if, by so doing, it would impair the principal of the pledgee's security."

■ The effect of the Maryland decisions, now superseded by statute, is that income of an investment represented by corporate stock belongs to the life tenant, whether included in a stock dividend or a cash dividend. The question before us is whether a stock dividend is a true dividend so as to be included in the reservation of dividends contained in the mortgage; and, as stated, the Maryland decisions are not determinative of this question. To apply the rule which they lay down with respect to the rights of life tenant and remainderman to the question before us, instead of the rule prescribed by reason for such a situation, is not required by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, or by any other decision. To reason from analogy and apply the rule because of what we may guess the Maryland court would have decided if the case had been before it, is to indulge in vain speculation. If the Maryland court, in any of the cases before it, had expressed an opinion on the question before us, which it did not do, it would have been a mere dictum, and one which we would have been under no obligation to follow. Carroll v. Carroll, 16 How. 275, 286, 14 L.Ed. 936; New England Mut. Life Ins. Co. v. Mitchell, 4 Cir., 118 F.2d 414, certiorari denied 62 S.Ct. 60, 86 L.Ed. —.

In Carroll v. Carroll, supra, the Supreme Court, after stating that the construction put by the state court upon a statute is not a decision to be followed within the stare decisis rule unless this was necessary to the determination of the rights of the parties before the court, went on to give the reason for the rule that dicta are without binding authority (and a fortiori the same is true of mere reasoning by analogy) as

follows [16 How. 287, 14 L.Ed. 936]: "And therefore this court and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties. In Cohens v. Commonwealth of Virginia, 6 Wheat. [264] 399 [5 L.Ed. 257] this court was much pressed with some portion of its opinion in the case of Marbury v. Madison [1 Cranch 137, 2 L.Ed. 60]. And Mr. Chief Justice Marshall said, 'It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent; other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.' The cases of Ex parte Christy [In re City Bank] 3 How. 292 [11 L.Ed. 603], and Peck v. Jenness, 7 How. 612 [12 L.Ed. 841], are an illustration of the rule that any opinion given here or elsewhere cannot be relied on as a binding authority, unless the case called for its expression. Its weight of reason must depend on what it contains."

After quoting the above in our opinion in New England Mutual Life Ins. Co. v. Mitchell, supra [118 F.2d 420], we said: "Nothing in recent decisions has in anywise weakened this rule or the sound basis of reason upon which it rests. In ascertaining the applicable law of the state, we are to consider court decisions and other available sources of local law; and we are to apply court decisions in the light of the well-established stare decisis rule and its limitations. Cf. West v. American Tel. & Tel. Co. [311 U.S. 223], 61 S.Ct. 179, 85 L.Ed. 139 [132 A.L.R. 956]. We are not required, however, to speculate as to how the state court might decide the question before us if it has not already decided it. Nor should we surrender our own judgment as to what the local law is on account of dicta or other chance expressions of the judges of the local courts. The respectful attitude towards the local court, where there has been no decision on the precise question before us, is to consider that question in the light of the common law of the state, with a view of reaching the decision which reason dictates, and with the faith that the local court will reach the same decision when the question comes before it. To base a decision upon dicta, or upon speculation as to what the local court might decide in the light of dicta, would be to depart from our solemn duty in the premises and embark upon a vain and illusory enterprise."

## 2. The Cash Dividends.

As heretofore pointed out, it is well settled in Maryland, as elsewhere, that, in the absence of express provision to the contrary, the pledgee of stock is entitled to the dividends declared thereon. The question here, then, is whether the reservation of dividends applies to cash dividends paid after the appointment of receivers. By sec. 1 of art. III of the mortgage the right to dividends is reserved, only if there is no default in the payment of interest which has continued six months, or no default in the payment of principal. Section 17 of art. IV goes further and provides that, upon the appointment of a receiver, the trustee shall be entitled forthwith to exercise the rights which by the terms of the mortgage it was authorized to exercise in the case of the occurrence and continuance of a default. Sec. 17 of art. IV is as follows: "Sec. 17. In case the 'Railroad Company' shall make default in any of the respects mentioned in section 2 of this article, and at the time of such default there shall be any existing judgment against the 'Railroad Company' unsatisfied and unsecured by bond on appeal; *or in case, in any judicial proceedings by any party other than the 'Trustee,' a receiver shall be appointed* of the 'Railroad Company,' or a judgment or order be entered for the sequestration of its property, *the 'Trustee' shall thereupon be entitled forthwith to exercise* the right of entry herein conferred and *also any and all other rights and powers herein conferred and provided to be exercised by the 'Trustee' upon the occurrence and continuance of default as hereinbefore provided,* and as matter of right the 'Trustee' shall thereupon be entitled to the appointment of a receiver of the premises hereby mortgaged, and of the earnings, income, revenue, rents, issues or profits thereof, with such powers

as the court making such appointment shall confer." (Italics supplied).

We think it clear that the Seaboard was to have the dividends only while it was not in default under the mortgage; and that by the express terms of the mortgage itself the appointment of receivers at the suit of creditors on the ground of insolvency constituted a default within the meaning of the terms as there used. Brackett v. Middlesex Banking Co., 89 Conn. 645, 95 A. 12. And since the reservation of dividends was for only so long as the Seaboard was not in default, no action on the part of the trustee was necessary to perfect its right thereto, once the default had occurred.

 And we do not think that a different conclusion is permissible with respect to the $20,025 dividend paid December 31, 1930. Although the dividend had been declared, prior to the appointment of receivers, to stockholders of record on December 18, 1930, which was also prior to their appointment, the dividend was not paid until after default had occurred as a result of the appointment of the receivers on December 23, 1930. The last clause of sec. 1 of art. III expressly provides that "until actually paid or discharged, every such * * * right to dividends * * * shall in all respects remain subject to the lien of this indenture." Under this provision the date of payment, we think, and not the date of the declaration of the dividend, is determinative of the effect of the default upon the rights of the parties. The special master so held, and we think correctly. The receivers contend that the clause quoted has application only to securities of underlying companies; but we do not think so. It is a part of the very section upon which the receivers base their claim of reservation of dividends in this particular stock, and is contained in a proviso limiting the general provisions of the section.

### 3. The Question of Liens.

 We do not think that any lien in favor of the receivers was impressed upon the stock dividend shares or the cash received by the receivers as cash dividends, either by the order appointing the receivers or by the orders authorizing the issuance of receivers' certificates. Although the certificates representing the stock dividend shares were in the possession of the Seaboard at the time the receivers were appointed, the stock evidenced thereby was subject to the pledge which had been made to the first mortgage trustee, and the trustee was entitled to the stock dividend certificate as pledgee of the original shares. The position of the trustee was stronger even than that of a person holding an equitable pledge of the shares (see Union Trust Co. v. Townshend, 4 Cir., 101 F.2d 903); for there was a valid legal pledge of the original shares and these stock dividend shares were merely a part of the thing already pledged. They were not merely something which the Seaboard had agreed to pledge when they came into existence, but an essential part of what it had already pledged and which were subject, for that reason, to the pledge already created. So far as the cash dividends are concerned, these were funds to which the pledgee of the stock was entitled under the pledge. As officers of the court, the receivers held these for the benefit of the person or persons lawfully entitled to them. Leonard v. Gage, 4 Cir., 94 F.2d 19, 23, 24.

 The appointment of receivers could not fix a lien either upon the stock dividend shares or upon the cash dividends which came into the hands of the receivers, for the reason that both were subject to the pledge made to the first mortgage trustee; and it is well settled that the appointment of receivers for a corporation does not affect the rights of others to property in its possession. As said by the Supreme Court in Quincy, etc., Railroad Co. v. Humphreys, 145 U. S. 82, 97, 12 S.Ct. 787, 792, 36 L.Ed. 632, as to the status of receivers: "They were ministerial officers, appointed by the court of chancery to take possession of and preserve, pendente lite, the fund or property in litigation; mere custodians, coming within the rule stated in Union Nat. Bank of Chicago v. Bank of Kansas City, 136 U.S. 223, 236, 10 S.Ct. 1013 [34 L.Ed. 341], where this court said: 'A receiver derives his authority from the act of the court appointing him, and not from the act of the parties at whose suggestion or by whose consent he is appointed; and the utmost effect of his appointment is to put the property from that time into his custody as an officer of the court, for the benefit of the party ultimately proved to be entitled, but not to change the title, or even the right of possession in the property.'"

It is true, of course, that the rights of general creditors are fixed upon the property of a debtor by a receivership, which is in the nature of legal process. John Hetherington & Sons v. Rudisill, 4 Cir., 28 F.2d 713, 62 A.L.R. 377. But, however important this may be in precluding the levy of attachments or the perfecting of liens, it does not add anything to·the title of the debtor or preclude the assertion of rights and equities by others to property in his possession. The receivers hold the property, as officers of the court, just as the debtor held it, subject to any rights or equities which could have been asserted against him. Fletcher's Cyc. of Corporation Law, vol. 16, sec. 7785; Clark on Receivers, 2d ed. sec. 256(a); Scott v. Armstrong, 146 U.S. 499, 507, 13 S.Ct. 148, 36 L.Ed. 1059; Burrowes v. Nimocks, 4 Cir., 35 F.2d 152, 156.

So far as the claim of lien by reason of the issuance of receivers' certificates is concerned, it is a sufficient answer that no holder of any of these certificates is before us claiming any such lien. We do not interpret the orders authorizing the certificates, however, as creating such lien. These orders created a first lien on the property of the Seaboard "in the possession or under the control of the receivers", but this did not reach the shares of stock of the R-W Company since they were not in the receivers' possession or under their control. It is true that the certificates covering the stock dividend shares were in their possession, but these certificates were not the shares of stock, which are intangible rights, but mere evidence thereof. The original shares had been pledged with the trustee and were not in any sense in the possession of the receivers; and the stock dividend shares, as we have shown, attached to these as a matter of law. The stock certificates, of course, had none of the attributes of negotiable paper.

The shares, it should be noted, were not mentioned in the orders authorizing the certificates. It is true that they were listed as free assets in an inventory furnished the court at the time of the application for the orders; but the inventory was furnished to show the financial condition of the company as a justification for the orders. No issue was presented as to whether the shares were free assets or not; and the orders contain no provision which could properly be construed as subjecting to the lien of the receivers' certificates any stock subject to the lien of a pledge. There is no contention that the original 4,550 shares were subjected to the lien of the certificates; and we think that stock dividend shares stand on precisely the same footing. No question is raised as to the power of the court to subject pledged property as well as mortgaged property to the first lien of receivers' certificates; but we agree with the court below that nothing was done which would subject to such lien the stock here in controversy or the dividends arising therefrom. It was certainly not intended to impress the lien of the certificates upon cash in possession of the receivers, who were charged with the duty of operating the railway system.

## 4. Waiver and Estoppel.

The point as to waiver and estoppel is based upon the fact that not until 1937 was demand made by the first mortgage trustee for the stock certificates covering the stock dividends and that, in the meantime, the receivers had been allowed to collect the cash dividends thereon and to retain the cash dividends paid on the original shares prior to 1932. No question of laches or the statute of limitations is involved; and there is no showing either that the trustee, with knowledge of its rights, intended to waive any rights as to either stock or cash dividends, or that, as the result of anything that it did, there was any change of position on the part of any of the parties which would render it inequitable for the receivers to be required to turn over to the trustee the funds and property of the trustee in their hands, to which, as we have seen, it is rightfully entitled under the pledge. As to waiver, the special master very aptly said in his report: "The fact that the first mortgage trustee allowed several years to pass before it demanded the stock dividend and the cash dividends paid thereon, and certain cash dividends on the original 4,-450 shares which had been collected by the receivers, is not sufficient evidence of an intention on its part that the receivers should retain these dividends. Rather, I think, the fair inference is that the first mortgage trustee was uncertain of its rights and acted upon the assumption that the dividends would be held by the receivers, as officers of the court, for the benefit of those entitled to them—whether these should turn out to be the receivers them-

selves, or the first mortgage trustee, or the refunding mortgage trustees."

As to estoppel, nothing need be added to the statement of the special master as follows:

"(1) There was no false representation or wrongful misleading silence. As a matter of fact, the trustees had to apply to the receivers in order to ascertain when the stock dividend had been declared, what was its amount, when the cash dividends had been declared, and their respective amounts.

"(2) There has been no statement of fact by the trustees to the receivers, nor indeed any statement of opinion as to the law.

"(3) The receivers were in full possession of all the facts, so that, as we have seen, it was necessary that the trustees should apply to them in order to learn them.

"(4) The receivers have not been adversely affected in any way by the silence of the trustees."

■ Under the facts as found, there is no basis for the application of the principles of either waiver or estoppel, and no reason in law or in equity why the court should not order the certificates and funds in its possession turned over to the person rightfully entitled to them. If, through error of law, or mistake as to the rights of the parties, dividends have been paid to the receivers, who are mere officers of the court, or certificates evidencing the stock dividend have come into their possession, there is no reason why the court should not direct that its officers respect rights which it would enforce through the medium of a resulting or constructive trust in other cases. As said by Lord Justice James in Ex parte James, L.R. 9 Ch.App. 609, 614, in a passage quoted by this court in Leonard v. Gage, supra [94 F.2d 24]: "The court, then, finding that he has in his hands money which in equity belongs to some one else, ought to set an example to the world by paying it to the person really entitled to it. In my opinion the Court of Bankruptcy ought to be as honest as other people."

■ The first mortgage trustee complains that the District Judge, without requiring a supersedeas bond, stayed the order for the delivery of the stock certificates covering the stock dividend shares for a period of three months or until the final determination of any appeals taken therefrom or application to the Supreme Court for certiorari. It appears, however, that the

receivers were required to hold the stock certificates and deposit the amount of the cash dividends in a special account, separate from their other funds, pending the determination of any appellate proceedings that might be taken, and that this requirement was complied with. Rule of Civil Procedure 73(d), 28 U.S.C.A. following section 723c, provides that, where property is in the custody or control of the court, "the supersedeas bond shall be fixed at such sum only as will secure the amount recovered for the use and detention of the property, the costs of the action, costs on appeal, interest, and damages for delay". A cost bond was duly filed; and, if the first mortgage trustee felt that any security was necessary in addition to the deposit required by the court, it could have applied to this court for relief under Rule 75(j). No such application was made, and we assume that, in as much as the appellants were trust companies and receivers of a great railway system, no additional security was deemed necessary. The question as to whether additional security should have been required by the court below as a condition of the stay order, pending appeal to this court, has now become moot, and we need not decide it. The stay order was too broad in providing for stay pending application for certiorari from the Supreme Court to this court; and it will be modified by elimination of that provision. Of course, the stay will be operative pending the receipt of our mandate by the court below; and our mandate will be stayed in accordance with our rules and upon such terms as may be just to permit application for certiorari.

For the reasons stated, the decree appealed from will be modified by adding the amount of the dividend of December 31, 1930, $20,025, to the amount of the dividends which the receivers are ordered to pay over and deliver to the first mortgage trustee, and by eliminating therefrom the provision as to stay pending application for certiorari; and as so modified it will be affirmed. The first mortgage trustee will recover its costs of the other appellants, against whom the costs of the various appeals will be taxed.

Modified and affirmed.

SOPER, Circuit Judge (dissenting).

There is no escape from the rule of Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R.

1487, that a federal court, exercising jurisdiction in a case on the ground of diversity of citizenship, must apply the law of the State in which it sits. The rule is endowed with all the vigor that comes from a recent decision that upset the precedents of a century, and it has been reenforced by the admonition that in such a situation "the federal courts must now search for and apply the entire body of substantive law governing an identical action in the state courts"; Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 209, 58 S.Ct. 860, 862, 82 L.Ed. 1290; "and must apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law' and however much the state rule may have departed from prior decisions of the federal courts." West v. American T. & T. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139, 132 A.L.R. 956.

We are obliged in the pending case to search for and apply the Maryland law in the interpretation of a trust indenture from a railroad company to a trustee to secure an issue of mortgage bonds, and to construe a clause of the contract that is without precise precedent in judicial decision in Maryland or elsewhere, so far as search of the authorities has disclosed. Certain bonds and stocks were pledged with the trustee by the Railroad Company as security for the mortgage debt, including 4,450 shares of the Richmond-Washington Company, one-sixth of the outstanding stock of a holding company which owned the Richmond, Fredericksburg and Potomac Railroad. As to these securities the mortgage provided in effect in Article 3 Section 1 that unless the Railroad Company should be in default in the payment of some interest upon its bonds for a period of six months, the trustee should not be entitled to collect the interest of any of the bonds or claims or indebtedness pledged with the trustee, and the Railroad Company should be entitled to receive all interest paid or dividends declared in respect of any bonds or stocks so pledged. Article 9 of the mortgage provided that until some default, the Railroad Company should be permitted to retain actual possession of the mortgaged premises and manage and operate and use the same, and collect and receive the earnings, income, rents and profits thereof.. It ·is plain from these provisions of the contract and from the continued operation of the mortgaged property by the mortgagor, that the Railroad Company was expected to hold and operate the railroad and to enjoy the income from its operation and its investments until default, while the trustee was to hold the tangible property and securities described in the mortgage as a pledge to ensure the payment of the mortgage debt.

It was under these circumstances and before any default on the part of the Railroad Company had occurred, that the Richmond-Washington Company declared a stock dividend of 50 per cent, which amounted to 2,225 shares on the holdings of the Railroad Company, and was delivered to it. The dividend was based on earnings which had accrued subsequent to the delivery of the stock in pledge to the trustee named in the mortgage. Now that the Railroad Company is in the hands of receivers, the question has arisen as to whether this dividend belongs to the trustee under the mortgage, as the representative of the bondholders, or to the receivers of the Railroad Company subject to the claims of other secured or general creditors.

We are not aided in answering this question by the general rule in Maryland and elsewhere that a dividend accruing upon pledged stock belongs to the pledgee; for a contrary provision has been made in the terms of the contract. We must determine whether under the Maryland law the provision of the contract, that the Railroad Company until default is entitled to dividends on the pledged stock, covers the stock dividend in this case. We are told that the stock dividend does not fall within the terms of the contract because a stock dividend is not a true dividend. The leading authorities cited for the rule in the opinion of the court in the pending case are the well known decisions of Gibbons v. Mahon, 136 U.S. 549, 10 S.Ct. 1057, 34 L. Ed. 525, and Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. These decisions are based upon the logical theory that a stock dividend really takes nothing from the property of the corporation and adds nothing to the interest of the stockholders; that it is not a realization of profits by the stockholders but a transfer of surplus to capital so as to be no longer distributable; while an ordinary dividend is a distribution of profits which the corporation makes and the stockholder realizes. Moreover, it is said that

the stock dividend in the pending case cannot fairly be described as a dividend payable to the Railroad Company within the meaning of the contract, because otherwise the interest of the Railroad Company in the Richmond-Washington Company, that originally amounted to a one-sixth interest, would be reduced to a one-ninth interest, and the security of the bondholders would be impaired.

These authorities and others like them, present the reasoning upon which is founded the so-called Massachusetts rule governing the apportionment of dividends between life tenant and remainderman under a trust set up by a will or deed. This rule is that stock dividends, regardless of their source, are invariably treated as corpus, and cash dividends are classified as income. If it is applied by analogy to the facts of the pending case, we must hold that the stock dividend in question belongs to the trustee under the mortgage. But the Massachusetts rule, although favored in the federal courts and in other jurisdictions, is not recognized in the law of Maryland. By a long line of decisions of the Court of Appeals of Maryland, a different theory known as the Pennsylvania rule was firmly embedded in the law of the State when the mortgage under consideration was executed in 1900 and there remained until it was repealed by Chapter 580 of the Laws of Maryland of 1939.

The Maryland cases involving stock dividends are: Thomas v. Gregg, 78 Md. 545, 28 A. 565, 44 Am.St.Rep. 310; Atlantic Coast Line Dividend Cases, 102 Md. 73, 61 A. 295; Coudon v. Updegraf, 117 Md. 71, 83 A. 145; Northern Central Dividend Cases, 126 Md. 16, 94 A. 338; Miller v. Safe Deposit & Trust Company, 127 Md. 610, 96 A. 766; Baldwin v. Baldwin, 159 Md. 175, 150 A. 282.

The cash dividend cases are: Quinn v. Safe Deposit & Trust Company, 93 Md. 285, 48 A. 835, 53 L.R.A. 169; Ex parte Humbird, 114 Md. 627, 80 A. 209; Foard v. Safe Deposit & Trust Co., 122 Md. 476, 89 A. 724; Washington County Hospital Ass'n v. Hagerstown Trust Co., 124 Md. 1, 91 A. 787, L.R.A.1915A, 738; Krug v. Mercantile Trust & Deposit Co., 133 Md. 110, 104 A. 414. See, also, Girdwood v. Safe Deposit & Trust Co., 143 Md. 245, 122 A. 132; Zell v. Safe Deposit & Trust Co., 173 Md. 518, 196 A. 298; and Heyn v. Fidelity Trust Co., 174 Md. 639, 197 A. 292, 1 A.2d 83, 739.

In Smith v. Hooper, 95 Md. 16, 51 A. 844, 54 A. 95, the court held that very large capital gains from the investment of the corpus of a trust estate should not be treated as income payable to the life tenant within the meaning of that term as used in the will creating the trust. It was not a dividend case. Certain expressions in the opinion of the court, including a reference to Gibbons v. Mahon, seem out of line with the Pennsylvania rule, but the decision did not shake the court's adherence to that rule, as an examination of the cases listed above will show. They are reviewed in the exhaustive opinion of Judge Offutt in Heyn v. Fidelity Trust Co., 174 Md. 639, 659-665, 197 A. 292, 1 A.2d 83, 739. He summed up the governing principle in the following words (174 Md. at page 664, 1 A.2d at page 90): "Insofar as any general principle may be deduced from these cases, it is, that where after the beginning of a trust holding stock for successive beneficiaries, a dividend is declared on that stock, if the dividend is payable from profits accumulated in the trust period, whether payable in cash or in stock, it is income and payable for the use of the life tenant, but if paid from surplus accumulated prior to the trust period from profits, the sale of the company's property (where such sales are not in the ordinary course of its business) or from any other source, and the dividend lessens the book or dollar value which the shares had when the trust began, to the extent necessary to restore that value the dividend is to be treated as capital and paid into the corpus of the trust estate. And that the declaration of the corporation as to whether the dividend represents earnings binds the parties to this case. Northern Central Dividend Cases, supra."

The Pennsylvania rule formerly prevailed in New York. It was analyzed by Cardozo, C. J. in Equitable Trust Co. v. Prentice, 250 N.Y. 1, 7, 164 N.E. 723, 63 A.L.R. 263, as follows: "The rule in this state was settled, until changed in 1926 as to subsequent trusts by an amendment of the statute * * * that as between life beneficiary and remainderman a stock dividend would be reckoned as principal or income according to the origin of the surplus out of which it was declared. To the extent that it distributed a surplus existing at the creation of the trust, it would be allocated to principal;

276

to the extent that it distributed a surplus earned thereafter, it would be allocated to income. * * * The search in all these cases was to find the intention of the founder of the trust and then to give effect to it. What is income for a corporation may not be income for a shareholder. * * * What is principal for a shareholder, when taken in his own right, may be income, when held in trust to be divided among others. So, at least, the cases hold. The thought back of them is this: A surplus in the treasury of a corporation, even though not income for the shareholder, is potentially a fund that may be converted into income. The declaration of a stock dividend destroys this potential income, and turns the surplus into capital. The effect may be at times to thwart the plan of apportionment between life tenant and remainderman, as conceived at the foundation. A founder of a trust has conveyed shares to a trustee, to pay the income to wife or child for life, with remainder upon death to others. Did he mean in thus apportioning his estate that potential income might be cut down through the vote of the corporate managers, so that the beneficiary never could resort to it, and principal increased to the profit of remaindermen, perhaps unknown or unborn? We have thought that intention would be best promoted if the fund thus permanently diverted were included in a gift of income. Very likely the word 'dividend' has had a part in shaping the conclusion, for in their typical or common form dividends are income, like other recurrent gains (Lynch v. Hornby, 247 U.S. 339, 344, 38 S.Ct. 543, 62 L.Ed. 1149), and one steps readily into the assumption that the equivalence is absolute."

The prevailing rule as to the disposition of extraordinary dividends between life tenant and remainderman, under the terms of a trust, is set out in the Restatement of the Law of Trusts, Vol. 1, Section 236, as follows:

"Except as otherwise provided by the terms of the trust, if shares of stock of a corporation are held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary,

\* \* \* \* \*

"(b) extraordinary dividends declared during the period, whether in cash or in shares of the corporation or in other property, are income to the extent and only to the extent that they are declared out of earnings of the corporation which accrued subsequent to the creation of the trust or the acquisition of the shares by the trustee;"

If this rule is applied in the pending controversy, the stock dividend will go to the Railroad Company, for the source of the dividend was income of the Richmond-Washington Company that had accumulated after the pledge of the stock was made, and the result will be that the Railroad Company will have the benefit of this income while the pledged stock remaining in the hands of the mortgage trustee will still be maintained at its original value.

But we are told that we are not obliged by Erie Railroad Company v. Tompkins to apply to the facts of the pending case the Maryland rule in respect to the respective rights of life tenant and remainderman in stock dividends, because thereby we should merely be reasoning from analogy and indulging in vain speculation as to what the Maryland court would decide if a case like ours should come before it. This warning, however, does not solve our difficulty or release us from the obligation to apply the law of Maryland. If the case is to be decided, we must have recourse to general principles or pertinent analogies, for there is no other guide. Indeed this court, itself, in passing upon the pending appeals follows this course. It cites in support of its conclusion in favor of the mortgage trustee Gibbons v. Mahon, 136 U.S. 549, 10 S.Ct. 1057, 34 L.Ed. 525, which involved the construction of a will that bequeathed corporate stock in trust to pay the dividends to a daughter of the testator during her lifetime, with a direction that upon her death the stock should revert to the estate of the trustee, and held that a stock dividend based upon earnings accumulated before and after the death of the testator did not go to the life tenant.

Similarly, the opinion in the pending case cites Hayes v. St. Louis Union Trust Co., 317 Mo. 1028, 298 S.W. 91, 56 A.L.R. 1276, that adopted the Massachusetts rule and decided a controversy over a stock dividend in favor of the remainderman in a trust under a will. Again, we find a citation from Virginia in Kaufman v. Charlottesville Woolen Mills Co., 93 Va. 673, 25 S.E. 1003, and a citation from North Carolina

in Lancaster Trust Co. v. Mason, 152 N.C. 660, 68 S.E. 235, 136 Am.St.Rep. 851, which related not to a pledge but to a sale of stock, and based their conclusions, that a reservation of dividends to the seller in the contract did not cover a stock dividend, on the reasoning of Gibbons v. Mahon, in which, as we have seen, the federal or Massachusetts rule was applied. In the Virginia case, Gibbons v. Mahon was cited for the express reason that it was analogous to the case at bar. The Supreme Court of the United States set the same example of reasoning by analogy in this field when it decided in Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570, a tax case, that a stock dividend is not income, and based its decision on the reasoning of Gibbons v. Mahon.

We have no call to demonstrate that these authorities announce unsound doctrine. That is not our province or responsibility; that has been done by the Court of Appeals of Maryland to its own satisfaction, and we have no alternative but to follow its deliverances. It is certain that we do not follow them, if we give preference to the contrary decisions of the courts of Missouri or Virginia or North Carolina or the United States.

No difficulty is experienced in applying the Maryland philosophy to the circumstances of the pending case. The parties to the mortgage intended that the Railroad Company should have the income from the pledged property. The word "dividend" was used to carry out this purpose, and if the dividend in suit represented income, it should go to the Railroad Company just as income from a testamentary trust estate goes to the life tenant. Judge Cardozo in the passage quoted above from his opinion in Equitable Trust Co. v. Prentice, shows that the term "dividend" ordinarily connotes income; and the court

in Gibbons v. Mahon, 136 U.S. 567, 10 S.Ct. 1062, 34 L.Ed. 525, gave the same interpretation to the word in the case of a testamentary trust, although the conclusion was reached, under the Massachusetts rule, that a stock dividend was not income. The court said: "Upon the face of the will, it is manifest that the testatrix used the word 'dividends' as having the same scope and meaning as 'income' and 'interest,' and nothing more; and intended that the plaintiff, as equitable legatee for life, should take the income, and the income only, of the shares owned by the testatrix at the time of her death; and that the whole capital of those shares, unimpaired, should go to the defendant, as legatee in remainder."

In Maryland, the opposite result would have been reached as to so much of the dividend as represented surplus that had accumulated when the trust came into being. The Court of Appeals takes the view that the conversion of accumulated income into capital by the declaration of a stock dividend does not impair the right of the life tenant to the income or defeat the purpose of the settlor of the trust.

It is true that an award of the stock dividend to the Railroad Company in this case would reduce the proportionate control held by the pledgee in the Richmond-Washington Company. But exactly the same impairment of the principal of a trust estate occurs when a stock dividend is given to the life tenant, and it cannot be that the rights of a pledgee are more sacred than those of a remainderman. The latter is sufficiently protected in the eye of the Maryland law if the value of the capital and accumulated surplus at the beginning of the trust is preserved in the principal of the trust estate. The same line of reasoning should govern us in our decision upon the pending appeal.