**F.D.I.C., Plaintiff–Appellant,**

v.

**W. HUGH MEYER & ASSOCIATES, INC., et al., Defendants–Appellees.**

**No. 87–1943.**

United States Court of Appeals,
Fifth Circuit.

Feb. 1, 1989.
Rehearing and Rehearing En Banc
Denied March 23, 1989.

T. Ray Guy, Dallas, Tex., Christine M. Anderson, Midland, Tex., for plaintiff-appellant.

E.F. Lohman, III, Abilene, Tex., for W. Hugh Meyer.

Jack N. Little, Big Spring, Tex., for Grambling & Mounce.

Harrel Davis, III, Victor M. Firth, Steven L. Hughes, El Paso, Tex., Richard Andrew Bonner, Odessa, Tex., for Willey F. James.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In 1982, Hugh Meyer signed an agreement pledging some stock to the First National Bank of Midland. The pledge agreement entitled the bank to a security interest in the dividends upon the stock, but neither the bank nor the FDIC, the bank's successor in interest, registered the pledged shares in the bank's name. As a result, dividends from the pledged stock were delivered to Meyer. Among these dividends was a stock dividend worth about $500,000. Meyer eventually pledged these dividend shares to his law firm, Grambling & Mounce, to secure payment of a $125,000 retainer. Meyer then went bankrupt. His total indebtedness to the bank is in the neighborhood of $3 million. First Midland became insolvent and went into receivership. The FDIC sued Meyer and Grambling & Mounce to get the dividend shares. The district court held that the law firm had a perfected security interest in the shares up to the amount of its retainer, and that the FDIC was an unsecured creditor of the Meyer estate. The FDIC appeals. Because we find that possession is essential under Texas law to obtain a secured interest in securities, and because the bank never obtained possession of the contested securities, we affirm.

I

Meyer regularly entered into financing agreements with First Midland. In 1982, he and the bank executed a "Separate Collateral Agreement," whereby Meyer pledged to the bank some stock (in Power Test) he owned, and the dividends thereon. Meyer delivered the base stock—five certificates—to the bank. Meyer testified that he did not realize that he had also pledged the dividends from the stock, that he did not intend to do so, and that, as was customary in the dealings between Meyer and the bank, the bank did not give Meyer a copy of the pledge agreement.

In September of 1983, various notes owed by Meyer's company, and personally guaranteed by Meyer, with a combined principal exceeding $2 million, matured and became due. These debts, plus interest, remain outstanding. In October of 1983, the comptroller declared the bank insolvent, and appointed the FDIC as receiver.

Shortly thereafter, Wiley James, a partner at Grambling & Mounce, met Meyer and began representing him. The FDIC sent Meyer a letter about the debts he had personally guaranteed. In December 1983, Grambling & Mounce, on Meyer's behalf, asked the FDIC for copies of any security agreements executed by Meyer in the FDIC's favor. In January 1984, the FDIC replied that such agreements were privileged. The FDIC's local counsel likewise refused to release the agreements.

The bank, and later the FDIC, could have stopped Meyer from receiving dividends on the pledged stock by registering its holding of the pledged stock, or by putting a stop transfer order on the stock. The bank and the FDIC had on file forms, signed by Meyer, that would have permitted them to take these actions. The FDIC finally put a stop transfer order on the stock in June of 1985. But by that time, the horse was out of the barn.

The "horse," for purposes of this suit, is a 19,580 share stock dividend issued by Power Test in April 1985, and received by Meyer. Meyer claims, and the district court found, that he pledged and delivered this dividend stock to Grambling & Mounce in May 1985 as security for his promise to pay the firm's retainer. The FDIC hotly contests this claim, arguing that Meyer did not deliver the dividend stock to the firm until November 1985.

In June 1985, the FDIC notified Wiley James of the FDIC's claim upon the dividend stock. Meyer claims that he discovered the FDIC's claim upon the dividend stock when he tried in July 1985 to sell the stock. He was prevented from doing so by the "stop transfer" order. Meyer claims that upon finding he was unable to sell the stock, he returned the stock to the law firm, and informed the law firm of the reasons for his inability to sell the stock.

In November 1985, Meyer and his lawyers executed a written retainer agreement which they claim memorializes the May 1985 pledge of the securities. The agreement recites that the pledged securities were deposited at Grambling & Mounce contemporaneously with the execution, in November, of the agreement. The law firm and Meyer say that this recital is erroneous. They say that the pledge and delivery both took place in May, but that no written agreement was necessary until November, when James decided that it was likely that Meyer would go into bankruptcy. The FDIC contends that the recital is accurate, or, alternatively, that Meyer and the law firm should not be heard to contest the accuracy of the recital.

Meyer did go into bankruptcy in December 1986.

The FDIC also filed this suit in December 1986. A bench trial was had on October 19, 1987, on which date the value of the contested shares declined significantly. On October 26, 1987, Judge Bunton rendered judgment for defendants, holding that Grambling & Mounce had a perfected security interest in the shares, and that the FDIC was an unsecured creditor of the bankrupt estate. The FDIC appeals.

## II

The outcome of this case turns upon interpretation of Article 8 of the Uniform Commercial Code, as amended in 1977 and enacted into Texas law in 1983. See Tex. Bus. & Com.Code Ann. § 8.101–8.408 (Ver-

non 1988 Supp.). That article governs security interests in securities. The key question is whether the Code recognizes a security interest in stock shares—more precisely, in the language of the code, "certificated securities" [1]—if the holder of the putative security interest has never possessed the shares. If not, then the FDIC is an unsecured creditor with respect to the dividend shares, and Grambling & Mounce is apparently the only secured creditor. Resolving this question of UCC law requires this court to write upon a rather clean slate.

There is a preliminary dispute between the parties as to the proper order of the issues. The FDIC asks the Court to consider first whether Grambling & Mounce took the stock as a bona fide purchaser, and then, if the Court finds that Grambling & Mounce did not, whether the FDIC had a perfected security interest in the stock. Meyer and the law firm contend that if the District Court was correct in its finding that the FDIC had no security interest in the stock and that Grambling & Mounce did have a perfected security interest, it is irrelevant whether or not Grambling & Mounce took without notice of any claims that the FDIC was trying to make.

■ We agree that we should first determine which, if any, parties developed security interests in the stock, and that we may thereby avoid the bona fides purchaser issue. Mere knowledge of a possible but as yet uncreated security interest does not suffice to defeat the perfected security interest of a later creditor. A contrary rule would undermine the "race of diligence among creditors" contemplated by the U.C. C. *See Matter of E.A. Fretz Co., Inc.,* 565 F.2d 366, 371 (5th Cir.1978).

■ The FDIC suggested, at oral argument and without elaboration, that if the FDIC never developed a security interest in the contested shares, the bona fides issue was nonetheless relevant because "there was a conversion" of the shares. This

---

**1.** Both the base stock and the dividend stock in this case were represented by certificates—i.e., were certificated. The UCC speaks of "security interests in securities." For the sake of clarity, we will refer to the contested dividend stock as stock, or as stock shares, except where it is necessary to invoke the exact language of the UCC.

argument begs the question. There can have been a conversion of an FDIC property interest only if the FDIC had such an interest. A mere unexercised contractual right to create a property interest is not itself a property interest. The question of whether the FDIC ever developed a security interest in the shares is thus necessarily antecedent to the question of whether a conversion occurred. Again, a contrary rule would undermine the incentives carefully established by the UCC's distinctions among secured interests, perfected secured interests, and other interests. If the FDIC never developed a security interest in the shares, and the law firm did develop a perfected security interest, it is plain that the district court's judgment is correct.

Article 8 of the Uniform Commercial Code, as amended in 1977 and enacted into Texas law in 1983, governs the creation and perfection of security interests in investment securities. The meaning of Article 8 is a question of law, and consequently we subject the district court's conclusions to *de novo* review. Under § 8.321(a), "A security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him pursuant to a provision of § 8.313(a)." As applied to this case, the provision just quoted means that the FDIC, and similarly Grambling & Mounce, can claim a security interest in the contested stock only if it took that interest pursuant to a valid "transfer" as defined elsewhere in the Code.

The shares of Power Test dividend stock are certificated securities: that is, they are investment securities represented by physical certificates. Section 8.313(a)(1) specifies how one may effect a valid transfer of a security interest in such shares of stock. There must be a physical transfer of the shares from the pledgor to the pledgee: "Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only at the time he or a person designated by him acquires possession of a certificated security." Tex.Bus. & Com.Code Ann. § 8.313(a)(1) (Vernon's 1988 Supp.). The section goes on to provide means by which security interests in

*uncertificated securities* may be transferred, and to discuss how security interests in either certificated or uncertificated securities may be transferred through a *financial intermediary.* These provisions of § 8.313 are facially irrelevant to this case. However, § 8.313(a)(9) might appear to have some bearing upon First Midland's claim. That subsection provides that a transfer of a security will occur "with respect to the transfer of a security interest where the transferor has signed a security agreement containing a description of the security, at the time new value is given by the secured party." This subsection, which does not expressly distinguish between certificated and uncertificated securities, appears to permit a creditor to develop a secured interest in stock shares without obtaining physical possession of those shares. By its terms, the subsection applies when, as in this case, a security interest is created by a written, signed agreement.

We need not, however, consider the application of § 8.313(a)(9) to this case. The parties have not even mentioned the subsection, much less briefed its significance. To apply the subsection, we would have to resolve two questions not presented to the district judge: (1) whether the security agreement "contains a description" of the dividend stock; (2) and when, if at all, "new value" was provided by First Midland. Both issues might be legitimately contested. The collateral agreement lists specifically only the base shares; dividend shares are mentioned only by reference to "profits, interest, and income [from] the listed property ..." Meyer signed the collateral agreement to secure promissory notes he had already issued. We do not reach these issues, because the FDIC did not raise them before the district court and so has not preserved them on appeal. Indeed, the FDIC expressly renounced any possible reliance upon § 8.313(a)(9) when, in its supplemental post-trial brief to the district court, it stated

FDIC agrees completely with Defendants' position that there is no such thing as an unperfected security interest in a

security. A secured party has a perfected security interest in a security or no interest at all. FDIC also agrees with Defendants' position that § 8.321(a) of the Texas Business and Commerce Code provides that a security interest in a security *is created only when the secured party takes possession of the security.* FDIC Supplemental Trial Brief at 6 (filed Oct. 23, 1987). We need not pass on the legal merits of this theory. The position asserted precludes the FDIC from raising, and us from considering, the import of § 8.313(a)(9) on appeal.

■ Our analysis of this case thus depends upon the interaction between §§ 8.313(a)(1) and 8.321. The implication of these two sections is that no party in this case can have acquired a security interest in shares of (certificated) stock without having taken actual possession of the stock certificates. The district court reached the same conclusion. Although there is little case law on this point, the relevant decisions do seem to assume that physical delivery is necessary to create a secured interest in certificated securities under the relevant provisions of Article 8. *See, e.g., United States v. Doyle,* 486 F.Supp. 1214, 1220 (D.Minn.1980) (applying amended version of UCC as enacted into Minnesota law; the case involves a "financial intermediary"). Every security interest transferred for value pursuant to § 8.313(a)(1), and thus any security interest created in this case, is a perfected security interest. *See* Tex.Bus. & Com.Code Ann. § 8.321(b) (Vernon's 1988 Supp.).

The FDIC proposes two ways to defeat this argument. First, the FDIC argues that an interaction between Article 8 and Article 9 gives it a perfected security interest in the dividend stock. Section 8.321(c)(2) provides, "A security interest in a security is subject to the provisions of Chapter 9, but no written security agreement signed by the debtor is necessary to make the security interest enforceable.... The secured party has the rights and duties provided under Section 9.207, to the extent they are applicable, whether or not the security is certificated, and, if certificated, *whether or not it is in his possession."* The FDIC draws attention to the concluding phrase. Section 9.207 provides in part that "unless otherwise agreed, when collateral is in the secured party's possession the secured party may hold as additional security any increase or profits (except money) received from the collateral...." Tex.Bus. & Com.Code § 9.207(b)(3) (Vernon Supp. 1988).

■ This argument appears question-begging. Section 9.207(b)(3) may mean only that *if* the pledgee receives increase or profit upon pledged collateral, the pledgee may rightfully keep the increase or profit. There is no dispute here that the FDIC could appropriately have retained the stock dividend as additional security had the FDIC ever received it. Rather, the issue is whether, given that Meyer received the stock dividend while the FDIC had a contractual claim upon it, the FDIC developed a security interest in the stock dividend. Section 9.207 does not appear to speak to that issue, and the FDIC does not cite any cases suggesting that the Section does so. Moreover, the FDIC's emphasis upon the concluding phrase in Section 8.321(c)(2) ("whether or not it is in his possession") is misplaced. On the FDIC's argument, the collateral referred to by that phrase is the base stock, and that stock was certainly in the FDIC's possession. The phrase is not a suggestion that a security interest in certificated securities can be obtained through means other than those specified in § 8.313. Rather, the phrase takes into account the possibility that a secured creditor might temporarily relinquish possession of the certificates after getting ahold of them.

■ Second, the FDIC asks the court to hold that its possession of the base stock impressed an "equitable lien" upon the dividend stock in favor of the FDIC. The FDIC bases this argument upon *Powell v. Maryland Trust Co.,* 125 F.2d 260 (4th Cir.) *cert. den.* 316 U.S. 671, 62 S.Ct. 1046, 86 L.Ed. 1746 (1942) (interpreting Maryland law), and upon a line of cases interpreting *Powell: Mathews v. Starr,* 475 F.Supp. 37 (E.D.Va.1979) (following *Powell* ) *rev'd sub nom. In re Mathews,* 626 F.2d 862 [Table],

29 U.C.C.Rept.Serv. 684 (4th Cir.1980) (ignoring *Powell*); *In re Whitaker*, 18 B.R. 314 (Bank.D.Kan.1982). The underlying ratio of *Powell* was that the stock dividend shares "were merely a part of the thing already pledged. They were not merely something which the Seaboard had agreed to pledge when they came into existence, but an essential part of what it had already pledged and which were subject, for that reason, to the pledge already created." 125 F.2d at 271. All parties to this suit apparently believe that the district court in the *Mathews* litigation accepted the equitable lien theory, and that the Fourth Circuit, in its unpublished opinion, rejected the theory and reversed *Powell sub silentio*.

In our view, the *Mathews* litigation does not necessarily overrule *Powell*, because *Mathews* involves Virginia law and *Powell* applies Maryland law. However, *Mathews* involved a stock split, not a stock dividend. 475 F.Supp. at 38. Whitaker likewise dealt with a stock split. 18 B.R. at 315. *Powell* also may have dealt with a stock split. *Id.;* see discussion of the character of the "stock dividend" in *Powell* as a mere record-keeping device which does not transfer profits to shareholders, 125 F.2d at 267; *see also* 18 B.R. at 317. Moreover, neither the *Mathews* cases nor *Powell* expressly considered the distinction between a contractual right to a stock dividend and a property (security) interest in the dividend. Finally, none of the cases was decided under the amended version of Article 8 of the U.C.C.

For these reasons, the cases cited by the FDIC do not justify application of the equitable lien theory in this case. Moreover, the Fourth Circuit's *Mathews* opinion, applying the unamended version of the U.C.C., rejected the equitable lien theory, even in the context of a stock split, precisely because possession is an absolute prerequisite to the creation of a security interest in stock shares. 626 F.2d 862, 29 U.C.C.Rept.Serv. at 686.

In summary, neither the language of the Texas code provisions nor any case law would favor reversing the district court's decision. The district court's ruling is consistent with the spirit of the U.C.C., which contemplates a "race of diligence among creditors." *Matter of E.A. Fretz Co., Inc.*, 565 F.2d at 371. This suit is the product of the FDIC's laxity. A diligent creditor would register its holdings, thereby guaranteeing its security and obviating the need for legal inquiry into the existence of an interest, or into the bona fides of a later claimant. Application of the general equitable theory proposed by the FDIC would be particularly inappropriate given the existence of a statutory scheme encouraging diligence, and given that the FDIC does not seek equity with "clean hands."

### III

The district court concluded from the evidence that Grambling & Mounce possessed the shares and developed a perfected security interest in them. First Midland never possessed the shares. In light of the analysis developed above, the district court's determination that Grambling & Mounce has a perfected security interest in the shares while First Midland is an unsecured creditor is both consistent with the law and supported by the evidence. The decision of the district court is therefore

AFFIRMED.