**PENTECH INTERNATIONAL, INC.,
Interpleader Plaintiff,**

v.

**WALL STREET CLEARING CO., Beuret & Company, Ltd., Shareholders and Consultants of Beuret & Company, Ltd., and Helmut Meister, Defendants.**

**Nos. 89 Civ. 5329 (WK), 89 Civ. 5363.**

United States District Court,
S.D. New York.

Sept. 4, 1991.

Richard S. Kalin, New York City, for plaintiff Pentech Intern., Inc.

Steven G. Brody, Cadwalder, Wickersham & Taft, New York City, for defendant Wall Street Clearing Co.

John M. Schwartz, Herzfeld & Rubin, P.C., New York City, for defendant Shareholders and Consultants of Beuret & Company, Ltd.

David R. Taxin, Dahan & Nowick, New York City, for defendant Helmut Meister.

## OPINION & ORDER

WHITMAN KNAPP, District Judge.

This interpleader action was commenced by Pentech International, Inc. ("Pentech") to settle competing claims to an underwriter's warrant entitling its holder to purchase Pentech securities. The warrant was issued in June 1987 to Beuret & Company, Ltd. ("Beuret"), a securities broker-dealer that subsequently deposited the warrant in a proprietary account it maintained with its

clearing broker, Wall Street Clearing Co. ("Wall Street").

The defendant-claimants include: Wall Street, which contends that it acquired a perfected security interest in the entire Warrant at—among other times—the time of the deposit; seven shareholders of Beuret, each of whom asserts a contractual interest in a portion of the warrant arising from an agreement made at the time he acquired the stock (the "Shareholders"); and Helmut Meister, a former Beuret employee, who asserts a claim to a portion of the warrant arising from his employment agreement ("Meister"). Although the now-defunct Beuret was named by Pentech as a defendant-claimant, no appearance has been entered on its behalf.

In addition, two tort claims have been asserted, both of which arise primarily from an attempt by Wall Street to acquire the entire warrant for itself: (1) the Shareholders assert against Wall Street a tortious interference with contract claim, contending that it improperly interfered with their contractual rights to portions of the warrant; and (2) Wall Street asserts against Pentech a claim for breach of fiduciary duty arising from Pentech's refusal to reissue the warrant to Wall Street.

Discovery having been completed, the matter is now before us on motions for summary judgment by all of the parties: the claimants each assert that they are entitled as a matter of law to prevail on their alleged rights of partial or full ownership of the warrant; and Pentech claims that as a matter of law the warrant should be returned to the now-defunct Beuret. In addition, both Wall Street and Pentech seek dismissal of the tort claims asserted against them.

For reasons that follow, we conclude that Wall Street is entitled to the warrant subject to claims of the Shareholders and Meister as provided below. We dismiss both tort claims.

## BACKGROUND

Beuret, a Delaware corporation, was a broker-dealer that, in addition to providing brokerage services to its clients, also performed underwriting services in connection with public offerings.

Beuret counted among its shareholders Gerard Fallon, Irwin Hochberg, Herbert Nevyas, Irwin Rosenbaum, Herbert Rubin, Laurence Winston, and Anthony Giglio (to whom we shall refer collectively as the "Shareholders"). With the exception of Giglio, they claim to have acquired their shares pursuant to agreements alleged to have been entered into during 1986. It is alleged that each such purchase agreement provided that as long as the purchaser remained a shareholder of Beuret, Beuret would assign to him a specified percentage of any warrants it received in connection with any public offering it underwrote. Giglio, on the other hand, became a shareholder in 1985. Pursuant to an amended shareholder agreement entered into and amended on November 1, 1985 and June 3, 1986, respectively, Beuret agreed to assign to Giglio 12.5% of any underwriter's warrants it received. The percentages claimed by these shareholders are set forth in the following schedule:

| | |
|---|---|
| Fallon | 1.0% |
| Hochberg | 0.5% |
| Nevyas | 2.0% |
| Rosenbaum | 0.5% |
| Rubin | 1.0% |
| Winston | 1.5% |
| Giglio | 12.5% |

In the spring of 1987, Beuret performed underwriting services for Pentech, in exchange for which Beuret received as part compensation the underwriter's warrant (the "Warrant") which is the *res* in this interpleader action. The Warrant was issued on June 12, 1987, and entitles its holder to purchase 50,000 underwriter's "units" at $6.30 per unit. Each unit consists of five shares of Pentech common stock and one option entitling the holder to purchase one additional share for $1.50.

The Warrant's terms also include a transfer restriction which prohibited until June 5, 1989 transfer, sale, assignment, or hypothecation of the Warrant to anyone other than officers of Beuret (the "Restric-

tion").[1] The Warrant further provides that it shall be "governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any principles of conflicts of law." Exh. 10, Brody Affid., ¶ 9.

On June 25, approximately two weeks after the Warrant had been issued, Beuret agreed in writing to assign 820 units of the Warrant to Meister, its employee, provided that he remain—as he did—in its employ through December 31 of that year.

By late 1987, Beuret had met with severe financial difficulties due in part to the October stock market collapse. Maucere Dep. at 94. It appealed to its clearing broker, Wall Street, for financial assistance. In response, Wall Street entered into certain subordinated loan agreements in December pursuant to which it lent to Beuret close to $1 million.[2]

Beuret's debt to Wall Street was enlarged by virtue of its obligations under their clearing agreement, which required Beuret to indemnify Wall Street for amounts owed on "introduced accounts" (*i.e.* accounts of customers Beuret had introduced to Wall Street). By early 1988,

the amounts so owed numbered in the millions.[3]

Beuret's financial situation continued so to deteriorate that by February it appeared it might have to go out of business. Maucere Dep. at 103. While Beuret concentrated on raising additional capital, Wall Street—well aware of Beuret's financial distress—began requesting of it some sort of "protection". Several meetings were held between Beuret's chief executive officer, John Maucere and Wall Street's chief executive officer, Denis Kelleher, executive vice-president John Gabriel, and president Richard Walter Lee. An oral agreement was ultimately reached pursuant to which Beuret agreed to deposit into its proprietary trading account at Wall Street six underwriter's warrants—including the Warrant here at issue—that had been issued to it by various investment banking clients. Unlike the Warrant here at issue, at least three of the others—including one that later became the subject of state court litigation [4]—were not subject to any restriction on transfer at the time of delivery. Gabriel Dep. at 105–06; Exh. A to Exh. 4, Brody Affid. in Further Support, at 2. According to Kelleher, the deposit was intended to provide Wall Street with "additional

1. The Restriction had been required by the National Association of Securities Dealers, Inc. ("NASD"), which asserts that its purpose is "to preclude an underwriter from realizing value from the exercise of a warrant prior to the market placing an independent value on the securities that were distributed to the public." Exh. D, Stone Affid. It provides in relevant part:

> 2. *Transfer.* Except for transfers to officers of Beuret & Company, Ltd., the Underwriter's Unit Purchase Option [*i.e.,* the Warrant] shall not be transferred, sold, assigned, or hypothecated for a period commencing two years from the effective date of the Registration Statement [June 5, 1987]. Thereafter, any assignment permitted by the terms hereof shall be effected by the Holder [Beuret] by (i) executing the form of assignment at the end hereof and (ii) surrendering the Underwriter's Unit Purchase Option for cancellation at the office or agency of the Company [Pentech] ... whereupon the Company [Pentech] shall issue, in the name or names specified by the Holder [Beuret], a new Underwriter's Unit Purchase Option or Underwriter's Unit Purchase Options [warrant(s)] representing in the aggregate rights to purchase the same

> number of Underwriter's Units as are purchasable under the Underwriter's Unit Purchase Option surrendered [Warrant]].
> Exh. 10, Brody March 27 Affid.

2. While Wall Street Clearing asserts that Beuret borrowed $1.1 million, the Shareholders assert that Beuret incurred a new obligation of only $750,000.

3. Among the "introduced accounts" was the personal account of John Maucere, Beuret's chief executive officer. In March of 1988, Maucere had accumulated a debt to Wall Street of approximately $1.3 million, which debt Beuret was obligated under the clearing agreement to indemnify. According to Wall Street, because of the margin credit extended to introduced accounts as well as the decline in value of securities in such accounts, Beuret owed Wall Street approximately $6 million by June of 1989.

4. A warrant that had been issued by First World Cheese, Inc. was the subject of litigation in New York State Supreme Court involving many of the same parties now before us. *See, infra,* note 14.

protection" and "to give us a better feeling of comfort while [Beuret was] in the process of organizing to do [a] public offering." Kelleher Dep. at 14, Exh. 28 to Brody Affid.

The Warrant—along with the five others—was delivered to Wall Street on February 10. Each warrant was accompanied by a transfer form signed by Maucere, who had left blank the space for designating the transferee. The warrants were then deposited in Beuret's proprietary trading account.

Around the same time, Wall Street began to learn of the various claims to portions of the Warrant asserted in this litigation. During the course of the discussions that had preceded its delivery, Maucere made known to Wall Street that various Beuret employees—including Meister—were entitled under their employment agreements to portions of each of the warrants. In fact, before delivering them, Maucere attempted to extract from Wall Street a promise that such commitments would be honored. As he testified:

I had to stand consistent in my desire and consistent in my representations to my employees, in particular those people that pulled the sled every day, so to speak, not the shareholders, but the people who pulled the sled every day, that they would get their warrants.

Maucere Dep. at 103.[5] However, according to Maucere, Kelleher resisted reducing any such promise to writing. Maucere Dep. at 103, 135.

Instead, it appears, Wall Street sought to secure for itself a written statement from Beuret expressly disclaiming all third party interests in the warrants. To this end, it presented to Maucere a proposed pledge agreement that provided in relevant part: [6]

[Beuret] hereby grants to [Wall Street] a security interest, in the entire rights, title and interest of [Beuret] in and to the Underwriters Warrants.

[Beuret] represents and warrants to [Wall Street] that:

(a) The Underwriters Warrants are owned by [Beuret] free and clear of all liens, encumbrances and rights of others whatsoever;

* * * * * *

(c) This Agreement creates a valid first lien on and perfected security interest in the Underwriters Warrants.

Exh. 7, at p. 2, Schwartz Affid. Maucere refused to sign the agreement because it did not provide for the distribution of portions of the warrants to Beuret's employees.[7] See Maucere Dep. at 144, Exh. 20, Schwartz Affid.

While Maucere plainly exhibited less concern for the Shareholders' claims than he did for those of the employees,[8] Wall Street became aware of the Shareholders' claims

---

5. In this regard, Maucere further testified:
A: The substance [of the conversation] was that in fact I would deliver the collateral as long as I was satisfied that certain individuals would receive their warrants.
Q: And did you specify who those individuals were during the discussion?
A: Yes.
Q: Did you specify that in writing at that discussion?
A: No, we were having a discussion.
Q: Did you mention Mr. Meister's name during that discussion?
A: I mentioned all those individuals in the firm that had performed on behalf of the firm and were entitled to receive those rewards for performance, and that list included Helmut Meister.
Maucere Dep. at 26.

6. The record is unclear as to when the pledge agreement was presented to Maucere. Accord-

ing to a Wall Street Clearing internal memorandum dated March 17, 1988, the agreement was presented to Maucere "one month or more ago"; according to Maucere's deposition testimony, it was presented to him some time in March. Compare Exh. 12, Schwartz Affid. with Exh. 20, Schwartz Affid. at 144. The proposed agreement is dated February 5.

7. According to a March 17, 1988 memorandum from Wall Street's executive vice-president John Gabriel to its president Richard Lee, "John Maucere has consistently ducked the issue of signing the ... pledge agreement ... sent to him one month or more ago." Exh. 12, Schwartz Affid.

8. Maucere testified that prior to February 10, he discussed with Wall Street Clearing only distribution of portions of the warrants to Beuret employees. Maucere Dep. at 135.

no later than shortly after the warrants' delivery.[9] Thus, for example, Kelleher testified that he received from Maucere a letter which stated: "Beuret is obligated to transfer an average of approximately 55% of [the] warrants to *stockholders,* brokers and other employees pursuant to various agreements." Exh. 9 (emphasis added), Schwartz Affid. Moreover, on March 23 Wall Street received from Maucere a handwritten list of claimants to portions of the warrants, which list included the names of the Shareholders. Schwartz Affid., Exh. 10, and Exh. 21 at p. 104. In addition, in late April of 1988, Wall Street's counsel, Richard Lee Stone, had several discussions with shareholder-claimant Fallon[10] about the Shareholders' claims to the warrants:

> [Fallon] indicated to me that these parties claimed certain interests or rights with respect to underwriters warrants that were formally owned by Beuret and that he would like to resolve the matter of their interest in these warrants by having Wall Street somehow effect some type of transfer ... to these persons.

Exh. 23, pp. 105–06, Schwartz Affid.; *see also* Fallon April 22, 1988 Letter, Exh. 14, Schwartz Affid.

After the warrants' delivery on February 10, Beuret's financial woes persisted, and within two weeks, it closed its doors. Maucere Dep. at 118. Maucere, who thereafter took up employment at a financial consulting firm, continued to press Wall Street about the various third-party claims to the Warrant, which remained in Beuret's proprietary trading account at Wall Street and regularly appeared on that account's monthly statements. Gabriel Dep., Exh. 21, Schwartz Affid., at 99, 104; Exh. 21, Brody Affid.; Kalin Dep. at 78, 133.

On June 21, 1989, approximately sixteen months after the Warrant had been deposited and approximately two weeks after its Restriction had expired, Wall Street withdrew the Warrant and presented it—together with a completed transfer form—to Pentech for reissuance in Wall Street's name. Exh. A, Kalin Affid. According to Wall Street, in taking such action it was exercising its security interest in the Warrant in order to reduce Beuret's debt to it which then exceeded $6 million. Goetschius Aff. ¶ 15.

By letter dated July 3, 1989, Pentech refused to effect the reissuance on the ground that "Mr. Maucere and/or Beuret's execution of the Transfer Form [in February 1988] was ... a violation of the terms of the [Warrant] and is invalid." Exh. 23, Brody Affid.

Two weeks later, Pentech commenced an unrelated state court action against Beuret arising from an alleged breach by Beuret of a consulting agreement that had been entered into in June of 1987. Shortly thereafter, Pentech obtained a default judgment against Beuret in the amount of $45,000.

While it was pursuing its breach of contract claim in state court, Pentech received written notice from the Shareholders and from Meister of their respective claims to the Warrant.[11] On August 8, it filed the instant interpleader action. The next day Wall Street filed a separate action against Pentech, seeking to hold it liable for its refusal to reissue the Warrant in Wall Street's name. This second action was assigned to us as related to the interpleader action and, over Wall Street's objection, was consolidated with it.

---

**9.** Indeed, Maucere's uncontroverted testimony suggests that Kelleher—and so, Wall Street Clearing—was aware of the shareholders' claims at or about the time of the warrants' delivery:

> A: Dennis Kelleher made it quite clear to me prior to or around February 10th that irrespective of my feelings, if [Beuret] were to go out of business, which quite frankly, it looked like it was going to, that the shareholders wouldn't have a claim to those warrants.

Maucere Dep. at 101. Obviously, Wall Street would not have ventured to evaluate the merits of the Shareholders' claims unless it already had notice of them.

**10.** Shareholder Fallon is an attorney, whose firm had been retained by the Shareholders to protect their interests in the Warrant. Exh. 14, Schwartz Affid.

**11.** The letters received by Pentech on behalf of the Shareholders and Meister were dated, respectively, July 26 and 31. Exhs. C and D, Kalin Affirmation.

The parties' respective positions as asserted in the instant motions for summary judgment may be summarized as follows:

(1) *Wall Street.* Wall Street contends: (a) that it is entitled as a matter of law to the entire Warrant on the ground that it acquired a first perfected security interest in the Warrant,[12] which interest, it is claimed, prevails over the interests of the Shareholders and Meister irrespective of whether or not Wall Street had notice of them when it acquired its own; (b) that the claims of five of the seven Shareholders must be dismissed on Statute of Frauds grounds; and (c) that the Shareholders' cross-claim against it for tortious interference with their shareholder agreements must be dismissed on the ground that its actions were reasonably justified.

(2) *Meister.* Meister contends that, pursuant to his employment agreement with Beuret, he is entitled as a matter of law to his claimed portion of the Warrant.[13]

(3) *The Shareholders.* The Shareholders primarily contend that Wall Street took subject to their contractual rights because it had notice of them when it acquired its security interest.

(4) *Pentech.* Pentech contends: (a) that it is entitled as a matter of law to rescission of any transfer of the Warrant to Wall Street and that the Warrant should therefore be returned to Beuret; and (b) that Wall Street's claim against it for breach of fiduciary duty must be dismissed because it acted in good faith when it refused to reissue the Warrant.

**12.** Wall Street has taken inconsistent positions as to the date on which it acquired its interest in the Warrant. *Compare* Wall Street Mem. in Support at 18 (asserting that security interest was acquired on February 10, 1988 when the Warrant was deposited in Beuret's proprietary account) *with* Oral Argument Tr. at 57 (asserting that security interest was acquired in June 1989 when the Restriction expired and the Warrant was presented to Pentech).

**13.** Meister initially pursued his claimed interest in the Warrant on a third-party beneficiary theory, contending that he had been the beneficiary of an agreement between Beuret and Wall Street, pursuant to which Beuret had agreed to deliver the Warrant to Wall Street, in exchange

## DISCUSSION

*Meister's Claim.*

■ We conclude that any reasonable trier of fact would have to find that, at the time it received the Warrant, Wall Street had notice that Meister had a valid contract claim to a portion thereof. Wall Street therefore was aware that Beuret had no right to assign to it Meister's share. Accordingly, under the doctrine recognized by the Second Circuit in *Septembertide Pub., B.V. v. Stein & Day, Inc.* (2d Cir.1989) 884 F.2d 675, it follows that Meister's claim is superior to that of Wall Street. In *Septembertide,* the court, quoting from a New York Court of Appeals opinion, observed:

> It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more ... than his assignor.

*Id.* at 682.

Wall Street, however, offers the affidavit of a highly credited expert, Professor Egon Guttman, for the proposition that this doctrine has no application when the assignee asserts a perfected security interest, which, it is claimed, not only cuts off all prior contract claims, but does so even when the assignee acquired its interest with full notice of them. The only decision he cites for this proposition is *FDIC v. W. Hugh Meyer & Assoc., Inc.* (5th Cir.1989) 864 F.2d 371.

We find that *FDIC* in no way supports Professor Guttman's proposition. That case involved a dispute between two parties asserting interests in the same shares

for, among other things, its promise to honor Beuret's commitment to Meister (among other employees).

At oral argument, Meister—while not abandoning this third-party beneficiary theory—moved on the record for summary judgment based on the employment agreement itself. Wall Street was thereafter provided an opportunity to oppose the motion. It did so, relying solely on the contention rejected *infra,* namely that its perfected security interest prevails over all other interests in the Warrant irrespective of whether or not it had notice of such other interests when it acquired its own. *See* Brody June 24 Letter.

of stock. A bank asserted a contract claim which had not matured into a perfected security interest because of the bank's failure to reduce it to possession. The other claimant, whose interest was junior to that of the bank, had so reduced its interest by gaining possession of the stock. The Court of Appeals held that the junior had acquired a perfected security interest at the time it so reduced its interest. The first time that the junior thus acquiring a perfected security interest received any notice of the bank's claim was "in June 1985." *Id.* at 373. The district court specifically found—which finding was not disturbed on appeal—that the perfection had occurred "in May 1985." *Id.* at 372. It is thus plain from the face of the opinion that the junior holder received no notice of the bank's claim until the month *after* it had obtained its perfected security interest. Accordingly, *FDIC* does not support Professor Guttman's position that by acquiring a perfected security interest a holder may cut off all prior claims of which he or she already has notice.[14]

*The Shareholders' Claims.*

■ Assessing Wall Street's claim vis-a-vis those of the Shareholders' is more complex. Although it appears to us highly probable that a finder of fact would conclude that Wall Street had notice of the Shareholders' interests prior to the Warrant's delivery on February 10, 1988, we cannot say that the record establishes as a matter of law that Wall Street had such notice until the following April. We must therefore determine the earliest moment at which Wall Street can be deemed to have obtained its security interest in the Warrant.

It seems evident to us that this moment occurred on June 5, 1989, when by its terms the Warrant became transferable. Before then, the inclusion of the document describing the Warrant in Beuret's proprietary trading account could not be deemed to have vested in Wall Street an exercisable security interest. Indeed, Wall Street's own conduct is fully consistent with this conclusion, as it refrained from completing the transfer form—to which it had had access (along with the document describing the Warrant) since February 10, 1988—until after the Restriction had expired.[15]

■ Having concluded that Wall Street obtained its perfected security interest no earlier than June 5, 1989, and finding that Wall Street had notice of the Shareholders' claims more than a year before that date, we conclude that Wall Street took subject to the Shareholders' prior claims.

Neither of the decisions upon which Wall Street relies—*FDIC, supra,* and *Meister v. Wall Street Clearing Co.,* No. 14944/88, slip op. (N.Y.Sup.Ct. Aug. 3, 1988)—requires a contrary conclusion. Simply stated, neither involved the possession of a warrant (or other instrument) that was subject to a time restriction on its transferability on the date it was received by the person claiming a security interest.

■ We turn now to Wall Street's contention that the claims of five of the seven Shareholders—Hochberg, Winston, Nevyas, Rosenbaum, and Fallon (the "Five Shareholders")—must fall on Statute of Frauds grounds. Each of them claims to have paid a multiple of $50,000 for shares of Beuret stock pursuant to an agreement which also entitled him to a percentage of its warrants. However, none of the five— which include two lawyers, whom we presume to have been sophisticated, and a

---

**14.** The exhibits that have been submitted include three opinions issued by two New York Supreme Court Justices (McCooe, J. and Nardelli, J.) in the litigation over the First World Cheese, Inc. warrant. Exhs. 2, 5 and 7, Brody Affid. Although not cited by Professor Guttman, these opinions might be construed as supporting his position. Our reading of them, however, suggests that the precise issue here involved was not raised in that litigation. To the extent that—all taken together—they can be deemed inconsistent with our ruling, we decline to follow them.

**15.** Indeed, this is the position Wall Street appears ultimately to have assumed, as the following colloquy from oral argument indicates:

THE COURT: When the time elapsed it seems to me that [Wall Street] did get a security interest.

MR. STONE [Wall Street's Counsel]: That's our position. Oral Arg. Tr. at 28.

doctor—has produced a shareholder agreement signed by Beuret or an explanation by affidavit or otherwise as to why such substantial sums of money were advanced without receipt of any signed writing. On the other hand, the mass of the evidence leaves us satisfied that each of the five is entitled to some percentage of the Warrant.

In this regard, the Five Shareholders have presented a whole variety of documents including:

1. The signed shareholder agreement of Rubin, and four nearly identical unsigned agreements, one each for Winston,[16] Rosenbaum, Fallon and Hochberg. Each of the five unsigned agreements—which is essentially a form to be filled in—provides that the purchaser agreed to purchase (and Beuret agreed to sell) one "Unit," consisting of .75 shares of Beuret common stock and $25,000 in principal amount of a subordinated loan to Beuret. The stated consideration was $50,000 per Unit. In addition, the agreement entitled the purchaser to a percentage of any warrants received by Beuret, which percentage was to be either in an inserted amount or 0.5% per Unit purchased.

2. A proposed registration statement filed with the Securities and Exchange Commission dated October 26, 1987, which was prepared in part by Beuret's in-house counsel and is signed by Beuret in typed form (the "Registration Statement"). The Registration Statement includes a list of Beuret's stockholders, the date each purchased his shares, the number of shares purchased and the consideration paid thereofor. The following are among the list's entries:

| | | | Consideration | |
| Purchaser | Date of Purchase | Number of Beuret Shares Purchased | Cash | Subordinated Loan |
|---|---|---|---|---|
| Hochberg | January 21, 1986 | 7,500 | 25,000 | 25,000 |
| Winston | January 21, 1986 | 15,000 | 50,000 | 50,000 |
| Nevyas | January 21, 1986 | 15,000 | 50,000 | 50,000 |
| Rosenbaum | January 31, 1986 | 7,500 | 25,000 | 25,000 |
| Fallon | June 4, 1986 | 7,500 | 25,000 | 25,000 |
| Rubin | June 4, 1986 | 7,500 | 25,000 | 25,000 |

3. Maucere's letter dated February 10, 1988 stating that Beuret is obligated to transfer approximately 55% of the warrants to, among others, its stockholders.

4. A warrant distribution list sent to Wall Street by Maucere—with an identifying cover memorandum signed by him—on or about March 29, 1988, setting forth the names, addresses and social security numbers of, *inter alia*, the Shareholders.

5. An unsigned handwritten list identified by Maucere at his deposition as having been prepared under his supervision in March of 1988. The list contains a proposed breakdown for the distribution of the Warrant's 50,000 units to, among others, the Shareholders.

Upon analysis, these documents make it impossible to ascertain with certainty the specific entitlement of any of the Five Shareholders. However, we find that they do contain two unequivocal statements signed by Beuret. First, the signed form agreement presented by Rubin—which is not now being challenged—specifies that "[Beuret] will also be offering and selling [shares of its stock] to other investors on substantially identical terms." Exh. 4, Schwartz Affid., at 1. Second, the Registration Statement, which we have found to have been signed by Beuret, establishes that the Five Shareholders did indeed buy

---

**16.** Although Winston's agreement does not appear among the documents submitted to us, Wall Street concedes that it exists. Wall Street Mem. in Support at 9.

shares of Beuret stock for the precise consideration that they now allege. We shall therefore cut the Gordian knot by assigning to each the minimum percentage of the Warrant he would have received under the form contract that all parties concede was used. This has the following result:

| | |
|---|---|
| Hochberg | 0.5 % |
| Winston | 1.0 % |
| Nevyas | 1.0 % |
| Rosenbaum | 0.5 % |
| Fallon | 0.5 % |

Rubin of course is entitled to 1.0% of the Warrant as expressly provided in his signed shareholder agreement, and Giglio shall receive 12.5% as provided in the signed agreements produced by him.

*The Tort Claims.*

█ In light of our conclusion that Wall Street acquired its perfected security interest at a time when it already had notice of the prior claims of Meister and the Shareholders to portions of the Warrant, its claim against Pentech for refusing thereafter to honor its request for reissuance to it of the *entire* Warrant must fail. In short, Wall Street may not recover for its failure to obtain that to which—as we have now concluded—it was not entitled. We need not decide whether a different result would obtain had Wall Street made two separate demands upon Pentech: (1) for the portion of the Warrant to which we have found it to be entitled; and (2) for the balance it was claiming.

█ The Shareholders' claim against Wall Street for tortious interference also must be dismissed. As the Restatement (Second) of Torts makes clear, the misconduct giving rise to such a claim must be not only wrongful, but also improper. *See* Restatement (Second) of Torts § 773. Here, given the paucity of legal authority addressing the questions raised by Wall Street's asserted claim to the Warrant, there can be no doubt that such claim was asserted, not improperly, but in good faith.

*Pentech's Claim Seeking Return of the Warrant to Beuret.*

█ On a final note, we reject Pentech's claim that the Warrant was transferred to Wall Street in February of 1988 in violation of the Restriction and that it should therefore be returned to the now-defunct Beuret for distribution among its creditors. In the first place, notwithstanding any attempt by Wall Street to acquire a security interest in the Warrant before the Restriction expired, as discussed above it could not have succeeded in the endeavor. The Restriction itself precluded the very transfer Pentech alleges took place. Moreover, it would appear that Wall Street, by waiting until it had expired before seeking reissuance of the Warrant, honored rather than violated the Restriction.

In the second place, although Beuret was named by Pentech as a defendant-claimant, no appearance has been made on its behalf or on behalf of its creditors. Pentech has not cited—and our research has not revealed—any authority to support its apparent assumption of quasi-trustee status in this litigation. Nor, as a practical matter, has Pentech identified any person authorized to act on behalf of Beuret's creditors and to whom the Warrant could be turned over for distribution.

The two authorities Pentech has cited—. section 202 of the Delaware Corporation Law and *Tomoser v. Kamphausen* (1954) 307 N.Y. 797, 121 N.E.2d 622—have no application here. Pentech's reliance on the Delaware statute is plainly misplaced given that the Warrant expressly provides that it shall be governed by New York law. The *Tomoser* decision, on the other hand, involved a restrictive agreement among shareholders that had been violated when one of the shareholders sold his shares to a third party without first offering them for sale to the shareholder-plaintiff. The court rescinded the transaction, applying the common law rule that "one may not purchase and obtain good title to stock in a corporation when one knows of equities in another stockholder affecting such purchased stock." 121 N.E.2d at 624 The case is inapposite as here there has been no violation of the Restriction.

## CONCLUSION

In light of the foregoing, Wall Street is entitled to the Warrant subject to: (1) the

claims of the Shareholders in the percentages above set forth; and (2) the claim of Helmut Meister to 820 of the Warrant's 50,000 units. The tort claims of Wall Street and the Shareholders against, respectively, Pentech and Wall Street are dismissed. Let Wall Street submit a proposed judgment on one week's notice.

SO ORDERED.